LESTER'S EXECUTOR AND OTHERS V. SIMPKINS.

January 12, 1915.

Absent, Keith, P.

1. WITNESSES — *Examination — Prior Inconsistent Statement.*— After a witness has been put on his guard and questioned as to the contents of a paper which he said he had rewritten, he may, on cross-examination, be further asked if he had not on a former occasion (fixing time and place) made statements contradictory of his testimony as to the contents of the paper, for the purpose of testing the witness as to his recollection and credibility, and of contradicting him, if he denies it.

2. WILLS—*Testamentary Capacity—What Constitutes.*—A testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged, and to comprehend generally the nature and extent of the property which constitutes his estate and which he intends to dispose of, and to recollect the objects of his bounty, and hold them in his mind a sufficient length of time to observe their obvious relations to each other, and to be able to form some rational judgment in relation to them.

3. WITNESSES—*Experts—Hypothetical Question—What to Contain.*—A hypothetical question to an expert witness must embody all the material facts which the evidence tends to prove affecting the question upon which the expert is asked to express an opinion.

4. APPEAL AND ERROR—*Improper Evidence—When Harmless.*—A case will not be reversed on appeal because the trial court improperly admitted certain evidence where it appears that the case was otherwise made out and the illegal evidence did not and could not have affected the result.

5. WITNESSES—*Examination—Error in Preliminary Question.*— Where the final and material questions put to a witness are received without objection, a cause should not be reversed for error in permitting a mere preliminary question to be asked and answered.

6.  WILLS—*Undue Influence—Suggestions to Weak-Minded.*—The right and power of a testator to adopt the suggestion of a third person assumes the existence of a competent testator, and has no application to a case where the requisite testamentary capacity is not shown to exist. What might be entirely proper in the case of one possessing a sound mind and disposing memory is often such influence that an impaired, weakened and diseased mind could not well resist.

Appeal from a decree of the Circuit Court of Montgomery county. Decree for the complainant. Defendants appeal.

*Affirmed.*

On motion of the contestant the following instructions were given by the court:

"1.   The court instructs the jury that the burden is on the proponents of the will in this case to establish that the paper writing in question offered as the last will and testament of George E. Lester is the true last will and testament of the same George E. Lester, and to do so they must establish to your satisfaction the following facts:

"(1). That the paper offered in evidence and the whole paper was thoroughly understood by the said George E. Lester and intended by him to be his last will and testament.

"(2)   That at the time of the writing and signing thereof, the said George E. Lester was of sound and disposing mind and memory.

"2.   The court further instructs the jury that one of the issues involved in this contest is whether the decedent, George E. Lester, possessed sufficient mental capacity to make a will on the 16th day of April, 1911, at the time the paper writing offered in evidence in this case was executed, and the jury are now told that the test of testamentary capacity is that the testator must have had sufficient mind

and intelligence at the time the paper writing was executed to understand:

"First.   The nature of the business in which he was engaged.

"Second.   To recollect the property he was attempting to dispose of, to know and understand his relations to his blood kin or to others who might have claims upon him, and to determine the objects of his bounty, and the manner in which he wished to dispose of his estate with sense and judgment.

"And if the jury believe that the decedent did not at the time the alleged will was executed possess mental capacity to know and understand these things, then they must find against the will.

"3.   The court instructs the jury that it must appear, by clear and convincing evidence, that the testator, at the time of the execution of the paper, retained sufficient active mind and memory to enable him to collect and arrange in his mind the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and to be able to form some rational judgment in relation to them; and if the jury believe from the evidence in this case that the said George E. Lester, at the time of the execution of the paper in question, was unable to do this, then he was incompetent to make a valid will, and the jury should find against said will.

"4.   The court instructs the jury that former declarations of the testator as to the disposition of his property may be considered by the jury to show his feelings and affections towards the natural objects of his bounty; and in connection with other evidence, if any, may be considered by the jury to show his mental condition as reflecting upon testamentary capacity.

"5. The court further instructs the jury that in determining whether or not the paper writing in question is the true last will and testament of the decedent, George E. Lester, the jury has the right to consider the nature and character of the will, and if they find from the evidence that it is contrary to natural justice, they should take that fact into consideration along with the other facts and circumstances in the case, and the testimony of the witnesses in determining the question of capacity.

"6. The jury are further instructed that testamentary incapacity does not necessarily require that a person shall actually be insane. Weakness of intellect, regardless of now it may arise, may render the testator incapable of making a valid will, provided such weakness really disqualifies him from knowing or appreciating the nature, effect and consequences of the act he is engaged in.

"7. The jury are further instructed that testamentary incapacity does not necessarily require that a person shall actually be insane. Weakness of intellect, regardless of how it may arise, may render the testator incapable of making a valid will, provided such weakness really disqualifies him from knowing or appreciating the nature, effect and consequences of the act he is engaged in; and in passing upon the question of the mental capacity of the testator to execute the paper writing in question, the court tells the jury that creditable testimony of an attending physician occupies a high grade and such evidence is entitled to peculiar weight, and especially so in the case of the physician attending the patient through his last illness when said paper writing was executed.

"8. The court further instructs the jury that direct proof is not necessary to overthrow a will, but any facts and circumstances are sufficient as evidence that will satisfy the jury of the incapacity of the testator to make testa-

mentary disposition of his property at the time of the execution of his will.

"9.  The court instructs the jury that undue influence is any means employed upon and with the testator by which, under the circumstances and conditions by which the testator was surrounded, he could not well resist, and which controlled his volition and induced him to do what otherwise he would not have done."

*W. B. Kegley* and *R. L. Jordan,* for the appellants.

*Harless & Colhoun* and *V. M. Sowder,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

The bill in this cause was filed by Roxie Simpkins, *nee* Lester, an infant suing by a next friend, for the purpose of contesting the will of George E. Lester, deceased, which had been probated in the Circuit Court of Montgomery county, upon the grounds:  (1) That the deceased did not have testamentary capacity sufficient to execute said paper purporting to be his last will and testament; and (2) that undue and improper influence was exercised over him, by which he "was induced and persuaded to sign said paper writing because of his impaired condition of mind and influence of those around him."  To the bill the widow of the deceased, his executor and surviving children were made parties defendant, and they filed a joint answer thereto. Upon the pleadings an issue *devisavit vel non* was ordered and tried, in the trial of which the defendants to the bill occupied the position of plaintiffs, and the complainant as contestant of the will that of defendant.  The trial resulted in a verdict by the jury that the paper writing in question was not the true last will and testament of the said George

E. Lester, deceased, which verdict was approved by the court, and a final decree entered setting aside the will and finally disposing of the case, from which decree the widow, the executor and the surviving children of the deceased applied for and obtained this appeal.

It appears that the deceased, George E. Lester, was married to the wife, who survived him, fifty or more years prior to his death; that they had raised six children, five of whom, namely, W. M. Lester, Edward Lester, Ollie Roop, Emma Roop and Laura Finley, also survived, and that his other son "Mont." Lester, died about seventeen years before his father, leaving surviving him but one child, the appellee here, who was at the death of her father about two years of age, and who, from that time up to the death of her grandfather, lived with him and as a member of his family, enjoying every privilege and performing every duty to her grandparents as if she had been their own child, and for nine years prior to the death of her grandfather she was the only one of his descendants remaining at his home to administer to his comfort and care for him in his declining years, all of his other children having married and moved to their respective homes, having children of their own, and being settled in life, one of them in the far west, and another in Bland county, Va.

The deceased had started life in adverse circumstances and without education, but by industry and the exercise of good business judgment had accumulated an estate valued at his death at from $80,000 to $90,000, consisting of real estate, securities, live stock and other personal effects. He had been, up to within two or three months prior to his death, in the active management of his affairs, attending to all of his business, and had had little or no occasion to consult or to require the professional services of attorneys, or the counsel of any one else. But something more than a month prior to his death, at the age of 81 years, he became

enfeebled by reason of physical troubles with which he had been suffering for some time prior, and about April 12, 1911, he became confined to his bed by reason of a deep cold with symptoms of bronchial or catarrhal pneumonia. At that time and for several weeks prior appellee was confined to her bed with typhoid fever, and one of the physicians attending her made occasional calls upon the grandfather.

The paper writing purporting to be the will which is here contested was executed late in the day of April 16, 1911, and he died in the early part of the night of the next day. A short while before his death, when he realized that his health was failing, he mentioned to Mr. R. I. Roop, an attorney practicing in the county of Montgomery and living at Christiansburg, his purpose to make a will, discussing the matter in a general way with Mr. Roop, but did not at any time disclose to him the manner in which he intended to dispose of his estate, except that he mentioned one piece of land which he intended to give to his son, William Lester, a legacy of $500 to a Mrs. Lawrence, and stated that he intended to make his children equal, which, as Mr. Roop understood him, included his granddaughter, Roxie. At the last interview the deceased had with Mr. Roop, which was about two weeks prior to the date of his will which is contested, he requested Mr. Roop to come prepared the next time he came out to the country to write his will. The deceased lived twelve or fifteen miles from the town of Christiansburg, and apparently did not want Mr. Roop to take the trouble of making a special trip for this purpose. Mr. Roop's parental home was in the same neighborhood and only a short distance from deceased's home. On Saturday, the 15th of April, 1911, Mr. Roop was called to the country to write the will of an elderly lady living near his old home, and having in mind the deceased's request, went prepared to write his will on this same trip, if the deceased

should desire it. Mr. Roop, it appears, was a brother of two of the deceased's sons-in-law, and had a general idea of the character and extent of his estate, and took the precaution to prepare a skeleton form to be followed in drawing up the final draft of the deceased's will. From the deceased's expression to him that he (deceased) intended to make his children equal, Mr. Roop assumed that he included in this class his granddaughter, appellee, and in preparing the skeleton form of the will, he had included her. Upon reaching the home of his parents he learned that deceased was seriously ill and the next day, Sunday, April 16, 1911, he went over to deceased's home, reaching there shortly after midday, and found there some of the members of the family, including William Lester, a son of deceased, who was named as executor of deceased's will, and also Dr. Akers, one of the attending physicians: whereupon, and before going in to see the deceased Mr. Roop told Dr. Akers that the deceased had requested him to come prepared to write his will, and inquired whether it would be all right for him to go into the room of the deceased for that purpose, and Dr. Akers told him that it would, as in his (Dr. Akers') opinion it would not unduly excite the deceased, but that it would be well not to have any more people going into the room than was necessary. Thereupon Mr. Roop went into the room, and when testifying in this case says that the subject of disposing of his property was first mentioned by Mr. Lester, the deceased. At Mr. Roop's instance Dr. Akers was requested to remain to act as a witness to the will, and consenting to do so remained for some hours, waiting for the final draft of the paper to be finished, and then finding that it was getting late in the afternoon, and not wanting, as he states, to be a witness to the will, requested that he be excused and left. When Dr. Akers was requested to witness the will he was asked by John Roop, a son-in-law of the deceased, as to deceased's condi-

tion, to which Dr. Akers replied that "Mr. Lester was sink-
ing rapidly and if he made a will he would probably have to
make it that day."

Upon going into deceased's room, the matter of the dis-
position of his estate was gone over by Mr. Roop with him.
Among the matters discussed was the provision for his
granddaughter Roxie, and the provision for the widow,
notes of the deceased's directions being taken down by Mr.
Roop and written into the skeleton form of a will that he
had prepared, and then this rough draft was taken by Mr.
Roop, along with one J. W. Pepper, into another room and
read off by Mr. Roop while Mr. Pepper wrote out the final
draft of a will, which was thereafter executed by the de-
ceased as his will, Mr. Roop and Mr. Pepper being the wit-
nesses thereto, and thereupon Mr. Roop left the house
carrying with him the will, at the request of deceased, as
he states, and Mr. Pepper remained at the house during the
night. The following night the deceased, as already stated,
died.

In the paper writing purporting to be the will of the de-
ceased, appellee, his granddaughter, was given only a tract
of land of 150 acres, situated in Floyd county, worth from
eighteen hundred to twenty-five hundred or three thousand
dollars, this devise being to her for life, with remainder to
her lawful issue, if any, and in default of such issue with
remainder to his other children. She was also given one
thousand dollars in money absolutely, and an equal interest
with deceased's children in his mineral lands and minerals,
with remainder as to this interest in deceased's children in
the event the granddaughter died leaving no issue, while
ample provision was made for the widow, and the children
of the deceased were given an equal share of his estate with-
out qualification of enjoyment or condition.

The will in question, as observed, was executed within
twenty-four hours of testator's death and when he was

rapidly sinking, impaired in mind and wasted in body. Appellee contested the will upon the theory that its terms and provisions were so inconsistent with the testator's duty to her, and so conflicting with his uniform and often expressed intention to make her equal with his other children in the division of his estate that its execution was necessarily the result of the want of sufficient testamentary capacity to make a will, or to undue influence exercised over him by others, and when he was too feeble in mind and body to comprehend or to understand what he was doing.

Appellee offered the testimony of sundry witnesses as to previous declarations made by the testator with respect to the provision he intended to make for her in the disposition of his property, and also testimony as to the relation that had continuously existed between the testator and herself from her early childhood to the day of his death, and while she introduced evidence to sustain her charge of undue influence, the contest over the will was centered mainly around the charge of want of mental capacity at the time of its actual execution, evidence being offered in this connection not only as to testator's mental capacity at that time from other causes, but to prove that he had suffered for a number of years from Bright's disease, the tendency of which was to weaken the intellect.

The finding of the jury is simply that the paper writing in question "is not the true last will and testament of Geo. E. Lester, deceased," and, as already stated, the court approved that finding and entered its decree thereon, setting aside the alleged will. This decree we are asked to review and reverse upon a number of grounds, the first being because the court, over the objection of appellants, the proponents of the will, permitted a Mrs. Hambrick in giving her testimony for appellee, the contestant, to be asked and to answer two certain questions propounded to her, the

ground of the objection being that no foundation had been laid for the admissibility of this evidence.

It appears that J. W. Pepper, introduced on behalf of the proponents of the will, on cross-examination, disclosed the following facts: That the paper in question, written by witness, was at the dictation, not of testator, but of R. I. Roop, a brother-in-law of two of the heirs and legatees of testator, and that this dictation was from a type-written paper that had theretofore been prepared by Mr. Roop; that this type-written paper, from which Roop dictated contained provisions and bequests different from the provisions of the paper written out by witness, Pepper; that the testator, prior to the execution of the will, told witness of his intention to make Roxie (contestant) equal with his children in the distribution of his estate. Witness, Pepper, was asked: "Did you hear Mr. Roop say that the will would have to be re-written?" Ans. "I do not remember his saying that. We rewrote it."

The point sought to be emphasized by this cross-examination was, that a will other than the paper writing offered in evidence had been prepared, and clearly the answer of the witness tended to prove that fact. Witness does not admit, nor does he deny having read the contents of a paper formerly prepared as the testator's will, which he says "we rewrote." Having questioned the witness as to his knowledge of this former paper, and its contents, he was asked if he did not say to Mrs. Hambrick (the question fixing time and place) that Roxie should have an equal share with the other heirs? Ans. "I don't recall saying that." Having been put on his guard and questioned as to the witness' knowledge of the contents of the former paper which he says "we rewrote," evidence tending to prove that witness on a former occasion had made statements in conflict with and contradictory of his testimony as to the contents of the paper that had been rewritten was proper and admissible

9

for the purpose of testing witness as to his recollection and credibility. Accordingly, Mrs. Hambrick, a witness for appellee, after referring in her preceding answers to a conversation with Mr. Pepper, was asked the following questions and gave the following answers:

"Q. In the course of the conversation did Mr. Pepper say that in the first will Roxie was made equal?

"A. I don't remember that he said that in the same conversation. He said that to me in a conversation some time after the death of Mr. Lester, but I don't know it was at that time."

Then, after stating where the conversation occurred and who was present as well as she could remember, the witness, Mrs. Hambrick, was asked:

"Q. I understand you to say that Mr. Pepper did say the former paper did make Roxie equal?

"A. I heard Mr. Pepper use the language that she was equal in the first will."

Dr. R. F. Williams, a physician of ten years practice, introduced as a witness for contestant, after stating that he attended the testator in 1906, as he remembered, and found him unconscious—in a coma—brought on by Bright's disease, and that the effect of bronchial or catarrhal pneumonia setting in upon an old man who was suffering with Bright's disease would simply be "adding fuel to fire" and make the condition of his mind much worse, was asked a hypothetical question in which testamentary capacity was defined, concluding with, "and hold them in his mind a sufficient length of time to observe their obvious relations to each other and to be able to form some rational judgment in relation to them." Objection was made to this question, directed at the latter clause thereof just quoted, which objection the court overruled, and this ruling constitutes appellants' second assignment of error.

There is no merit in the assignment. The rule of testamentary capacity was defined, so far as necessary, upon the facts which the evidence in the case tended to prove, in *Huff* v. *Welch,* 115 Va. 74, 78 S. E. 573, to be that the testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged and to comprehend, generally, the nature and extent of the property which constitutes his estate, and which he intends to dispose of and to recollect the objects of his bounty. To add to this definition, that the testator must "hold them in his mind a sufficient length of time to observe their obvious relations to each other and to be able to form some rational judgment in relation to them," does not, as is argued for appellants here, enlarge the definition given or require—certainly not in this case— "a higher degree of understanding and design than the recent expressions of our courts have prescribed."

In *Tucker* v. *Sandidge,* 85 Va. 554, 8 S. E. 654, the court approved the rule that, in order to possess testamentary capacity, the testator must "undoubtedly retain a sufficiently active memory to collect in his mind, without prompting, particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and to be able to form some rational judgment in relation to them."

This rule was sanctioned in *Chappell* v. *Trent,* 90 Va. 933, 19 S. E. 314, when passing on instructions defining testamentary capacity.

Appellants recalled for cross-examination, witnesses Drs. Akers and Williams, and propounded to each a hypothetical question with a view of obtaining an opinion as to the testator's testamentary capacity at the time he executed the paper writing purporting to be his will, to each of which questions appellee, the contestant, objected, which objec-

tions the court sustained, and these rulings constitute appellants' third and fourth assignments of error.

The question propounded to each of the witnesses omitted the following material facts which the evidence tended to prove, viz: the testator's age at time of death; that he was at the time of executing the alleged will suffering from the effects of Bright's disease and bronchial pneumonia; that his respiration was 40, pulse 130, and his temperature three-fifths of a degree below normal; and that he was rapidly sinking, and actually died the following day.

It is a well settled rule that a hypothetical question to an expert witness must embody all the material facts which the evidence tends to prove, affecting the question upon which the expert is asked to express an opinion. *N. & W. Ry. Co.* v. *Spears,* 110 Va. 110, 65 S. E. 482; *City of Richmond* v. *Wood,* 109 Va. 75, 63 S. E. 449.

That the facts in this case pointed out as being omitted from the hypothetical question propounded to Drs. Akers and Williams, respectively, as expert witnesses, were material facts bearing upon the testamentary capacity of the testator is not and could hardly be seriously controverted; therefore, the court did not err in sustaining the objection to the question.

The fifth assignment of error is to the ruling of the court admitting testimony given by the appellee as to certain admissions made to her by Mrs. Olie Roop, one of the children of testator and a legatee under his will, the objection to this testimony being that the admissions of a legatee cannot be given in evidence to impeach the will where there are other legatees or devisees interested in sustaining it, and as sustaining this contention the case of *Whitelaw* v. *Whitelaw,* 96 Va. 712, 32 S. E. 458, is cited.

With respect to the case cited we deem it only necessary to say, that while it undoubtedly lays down a correct rule

in principle, the facts of that case are so wholly different from the facts of this that the doctrine should not be applied here. In the case cited, with the exclusion of the evidence as to admissions of Mrs. Yager, the contestant's case was without evidence to sustain the issue of either testamentary capacity or undue influence, while in this case the evidence as to Mrs. Olie Roop's admissions may be entirely excluded and still the evidence introduced in behalf of the contestant, without objection, is sufficient to warrant the finding of the jury against the will. If it be conceded, therefore, that the evidence as to Mrs. Roop's admissions with respect to undue influence exercised over testator at the time of the making of his alleged will, and as to his mental capacity to make a will at that time, should have been excluded, still the final judgment of the court sustaining the jury's verdict must be sustained, as it appears that the case was otherwise made out and the illegal evidence did not and could not have affected the result. *Norfolk Ry. & L. Co.* v. *Spratley,* 103 Va. 379, 49 S. E. 502.

The sixth assignment of error calls in question the ruling of the court refusing to exclude the following question propounded to Dr. Evans, a witness for appellants, on cross-examination:

"A patient suffering with Bright's disease and while suffering with the disease going into a state of unconsciousness shortly after making a will, dying the following day. Would that man, at the time of executing the will, have as clear a mind and as good an intellect as he had formerly and before he was afflicted?"

Objection was made to the question on the ground, as it would seem from the bill of exception, that there was no evidence to sustain the hypothesis that the testator was suffering from Bright's disease, and while so suffering went into a state of unconsciousness shortly after making the will in question. The ground for the objection to this ques-

tion is not sustained by the record. Dr. Akers, the attending physician upon testator during his last illness, testifying in the case, stated that upon the occasion of his first visit to testator on March 14, just one month and three days prior to testator's death, he found him suffering with symptoms of nephritis, or Bright's disease; that the most aggravating symptom discovered was the catarrhal condition of the bladder due to enlargement of the prostate glands and the retention of the urine; that while testator got better of that attack, on the 12th of April, about four days before his death, he began to decline and developed bronchial pneumonia, so that his condition on April 16, the date of his will, was serious, sinking and growing worse. Dr. Akers left the house about 4:30 o'clock p. m. and the will in question was executed by testator after he left. As already observed, Dr. Williams stated that he was called to see testator in the year 1906, and found him in a state of coma brought on by Bright's disease, from which he could never recover. J. W. Pepper, one of the attesting witnesses to the will and who remained over at the home of the testator for the night after the will had been executed, testifying for the proponents of the will, was asked and answered the following questions upon examination in chief:

"Q. Did Mr. Lester, so far as you recollect, Mr. Pepper, make any reference to the will after it had been signed and witnessed?

"A. I have a faint recollection of Mr. Lester saying something about he was not worth a dollar, or had disposed of every dollar he had; I couldn't say what language he used.

"Q. That was after the will had been signed and witnessed?

"A. Yes, sir.

"Q. Was Mr. Lester irrational or unconscious. I mean otherwise than asleep, at any time while you were there, after the will was signed?

"A. Yes, sir.

"Q. You mean he was irrational?

"A. He was unconscious.

"Q. When did he become unconscious?

"A. I could not say, because I don't remember. I know I thought two or three times while I was there—I say I don't remember how long I stayed—that he was dying."

It appears that this question put to Dr. Evans, which is complained of, was a preliminary one leading up to the final questions asked witness without objection by the proponents of the will, and on cross-examination, for the purpose of eliciting witness' opinion of the testamentary capacity of testator under the conditions as detailed by the attending physician in charge, and the sum and substance of witness' answers to the questions propounded to him was that, if testator died by reason of Bright's disease and also bronchial pneumonia, either or both, then his mind would likely be clouded twenty-four hours before his death; that bronchial or catarrhal pneumonia would be "but adding fuel to fire."

The next assignment of error is to the ruling of the court in refusing certain instructions offered by the proponents of the will—No. 1 A and No. 9—in amending their instruction No. 7, and in giving instructions numbered 1 to 9 asked by the contestant.

It would serve no good purpose to undertake to review the instructions as given by the court and which are hereinbefore set out in the statement of this case. Suffice it to say that they, in our judgment, fully and fairly submitted the issues of the case to the jury upon the facts which the evidence in the case tended to prove. The gravamen of the complaint by appellants of the instructions is that the question of undue influence, because of want of evidence, should have been eliminated from the consideration of the

jury, and as sustaining this contention *Huff* v. *Welch, supra,* is cited.

In that case there was, in fact, no evidence of undue influence, and a peremptory instruction eliminating that question from the consideration of the jury was proper, but that is not the case here. Leaving out of view the declarations of Mrs. Olie Roop, testified to by appellee, that the will in question was not the free and untrammeled act of the testator, but was the result of undue influence exercised over him when he was in a condition which rendered him incapable of directing the preparation of his will, or to understand intelligently the nature of the business in which he was engaged, other facts and circumstances which the evidence in the case tended to prove are as follows: The testator had discussed, on at least two occasions, the provisions of his proposed will with R. I. Roop, one of the subscribing witnesses to the will, and had indicated his intention of making all of his children and appellee, his granddaughter, equal in the distribution of his estate, designating certain bequests, including $500 to a Mrs. Lawrence who had lived in his home, and pointing out certain lands to be devised to his son, William Lester, which directions were embodied in the paper above adverted to, prepared by and in the office of the said Roop at Christiansburg; that the will in question was written by J. W. Pepper, the other subscribing witness thereto, at the direction and dictation of the said R. I. Roop, and at a time when testator was on his death bed, wasted in body and his mind poisoned by the effects of Bright's disease and bronchial pneumonia, with a pulse, respiration and temperature plainly indicating nearly approaching death, and when those engaged in preparing a will for him knew of his critical condition; that the draughtsman of the previously prepared "skeleton" of his will went to the house of testator, accompanied by his brother, John Roop, a son-in-law of testator, for the pur-

pose of writing a will to be executed by him; that on arrival at testator's home R. I. Roop and his brother, John, found a second brother, Tom Roop, and a son-in-law of testator, Mrs. Olie Roop, wife of John Roop, William Lester and the now widow of testator, that there the previously expressed intention of testator to bequeath $500 to Mrs. Lawrence, contained in the skeleton will formerly prepared by the attorney, Mr. Roop, was discussed by those present, out of the hearing of the testator, and was agreed to be left out, notwithstanding the draughtsman of the original skeleton of the will admits that while taking notes of the wishes of the testator as to the disposition of his property, his attention was again called to this desire and will of the testator that such provision for Mrs. Lawrence should be made. The explanation or excuse for omitting this bequest from the final draft of testator's will is that William Lester told him, Mr. Roop, that he need not bother about this provision, as he, William Lester, had told his father that he would see to it. It is also admitted by R. I. Roop that the final provisions for the widow of testator were not the free and voluntary expressions of his wishes, but the result of persuasion on his, Mr. Roop's part after consultation with the widow as to what would satisfy her, "and then reluctantly yielded to by testator when told that unless he did so provide the widow would renounce the will."

The case of *Chappell* v. *Trent, supra,* is quite similar in its facts to this case, and there the opinion of the court says: "It is undoubtedly true that a testator may adopt and act upon the suggestion of a third person, but this presupposes a testator of a sound and disposing mind and memory, and has no application to a case like this, in which the requisite testamentary capacity is not proved to exist. What might be entirely proper in the case of one possessing a sound mind and disposing memory is often such influence

that an impaired, weakened and diseased mind could not well resist."

The facts and circumstances surrounding the execution of the alleged will in this case were such that the court would have plainly erred had it by the instructions to the jury eliminated, as appellants sought to have done, the question of undue influence from their consideration.

Coming then to the consideration of the final contention of appellants, that the trial court should, upon their motion, have set aside the verdict of the jury because of want of sufficient evidence to sustain it, we deem it only necessary, in addition to the references made to the evidence in discussing other questions above, to advert to the following additional facts and circumstances which are uncontroverted, tending to sustain the fact charged, that testator at the time of the execution of his will in question did not have requisite testamentary capacity. Appellee, the contestant, when but an infant two years old, was received in the home of her grandfather, the testator, as a parting charge from her dying father, the eldest son of testator, cared for and reared as his own child. He considered and treated her as such, and because of her obedience to, consideration and loving care of him in his declining years, she possessed his love and esteem to the utmost degree. The testator regarded, thought and spoke of her as his own child, and when possessing testamentary capacity he time and again expressed his affection for her and his intention of making her equal with his own children in the final disposition of his estate by will, so expressing himself but a few days before taking his bed in his final illness to the draughtsman of a skeleton will for him, and was so understood by this draughtsman to the end that the granddaughter was made equal with all the children of the testator in the skeleton will prepared by him, such being testator's uniformly expressed feelings and

purpose covering a period of many years and up to the very hour of the making of the will alleged to have been executed by him.

Considering these facts along with all the other facts and circumstances which the evidence in the case tended to prove, the jury, as it seems to us, were well warranted in finding that the alleged will of the testator giving to his said grandchild a mere pittance of his large estate, and that too to be enjoyed by her in so far as it consisted of land for life, in the event that she died without lawful issue, could only be accounted for by the fact that at the time of the execution of this paper writing as his will the testator did not possess sufficient mental capacity to make and publish a will disposing of his large estate with sense and judgment and in accordance with his wishes. Not only so, but the testimony given by Dr. Akers, the attending physician, with an actual practice of thirty years, and whose standing as a physician and whose integrity is not questioned, as well as other expert testimony in the case, was quite clear and positive that the testator did not possess sufficient mental capacity to execute the alleged will.

There is no error in the decree of the circuit court complained of, and it is, therefore, affirmed.

*Affirmed.*