# CASES DECIDED

IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### Wytheville.

JOHN T. CORE AND C. WALTHALL CORE v. JAMES C.
CORE'S ADMINISTRATORS, ET ALS.

June 12, 1924.

1. WILLS—*Undue Influence—Fraud—Declarations of Testator—Case at
Bar.*—In the instant case, a will contest, in support of the contention
that the will had been procured by fraud and undue influence on the
part of the brother and niece of the testator, the contestants under-
took to introduce the declarations of the testator as showing such
fraud and undue influence.

   *Held:* That the lower court properly excluded evidence relating to
   declarations made by the deceased as to fraud on the part of his
   brother and the efforts of his brother to induce or persuade him to
   make a will in the manner that the brother desired.

2. WILLS—*Declarations and Admissions of Testator—Undue Influence and
Fraud—Testamentary Capacity.*—The declarations of the testator, not
made contemporaneously with the execution of his will, are relevant
evidence to show his feelings, his affections toward the natural ob-
jects of his bounty, his mental condition, as reflecting upon his
testamentary capacity, but are not admissible to establish the sub-
stantive fact of undue influence, or that another had procured him
by fraud to execute his will, or to insert a certain provision therein.
The testator's assertions of fraud and undue influence are plainly
inadmissible under the hearsay rule.

3. WILLS—*Declarations of Testator—Mental Capacity—Undue Influence—
Fraud.*—The distinction between declarations of the testator which
are admissible to show the mental capacity of the testator, and
statements made by him offered to show the substantive fact of
undue influence, is in practice sometimes exceedingly difficult to
apply.

4. WILLS—*Declarations of Testator—Mental Capacity—Undue Influence—Fraud—Case at Bar.*—In the instant case, a will contest, the court excluded declarations of the testator tending to show fraud and undue influence exercised over the testator by his brother. Some of the statements offered for this purpose tended in some measure to indicate the mental attitude of the testator, as well as his testamentary purposes, and if the statements had been separable and separated from the statements tending to show the substantive fact of undue influence, they would have been admissible. But no effort was made to separate the admissible from the inadmissible, and such parts as were admissible were mainly cumulative.

*Held:* That the lower court did not err in excluding the declarations.

5. WILLS—*Testamentary Capacity—Conclusiveness of Verdict of Jury—Case at Bar.*—In the instant case, a will contest, one of the chief questions in issue was whether the testator was mentally competent to make a will. The testimony on this point was voluminous and sharply conflicting. The will itself contained no indication of any confusion of thought. All of testator's nearest relatives were named as beneficiaries. There was nothing in the will which was contrary to the testator's previously expressed purposes, or to natural justice, and nothing to indicate mental aberration. The medical testimony was also conflicting.

*Held:* That whether there was room for difference of opinion about testator's mental capacity or not, the verdict of the jury sustaining the will was conclusive.

6. JURY—*Juror Related to Witness in the Case.*—In the instant case, before the jury were sworn, it was suggested to the trial court judge that one of the talesmen was a brother of one of the witnesses in the case; whereupon the court, of its own motion, ordered this talesman to stand aside and had another one of the panel to take his place in the jury box. The case was one in which the credibility of the witnesses was to be determined by the jury.

*Held:* That the action of the trial court was both proper and commendable.

7. JURY—*Impartial Jury—Duty of Trial Court.*—It is always the duty of the trial court to secure a fair jury and to avoid, if possible, any suspicion of unfairness.

8. WILLS—*Contest of Will—Testamentary Capacity—Delusions of Testator.*—In the instant case, a will contest, the lower court refused to permit a witness to relate that on one occasion the testator accused the witness and his brother of having stolen his wood, when they had not taken his wood. The occurrence took place more than six months after the date of the will. Counsel did not indicate how they proposed to follow this evidence up, or what was the purpose of its introduction.

*Held:* That if this evidence was offered to show insane delusions, and had been properly supported, it should have been admitted, but that under the circumstances its exclusion was not reversible error.

9. Fraud and Deceit—*Undue Influence—Presumptions and Burden of Proof.*—Fraud and undue influence are never presumed. The burden of showing undue influence rests upon those who allege it, and it cannot be based upon bare suggestion, innuendo, or suspicion. The undue influence which will vitiate a will must be of such a character as to control the mind and direct the action of the testator.

10. Wills—*Fraud and Deceit—Undue Influence—Evidence Insufficient to Establish—Case at Bar.*—In the instant case, a will contest, conceding the truth of all of the testimony which was offered on the part of the contestants, it fell far short of showing that the testator's brother, an old man about eight years older than the testator, and who died four months earlier, directed, fraudulently controlled, or improperly influenced the testator in the final disposition of his estate under the will attacked.

Error to a judgment of the Circuit Court of Northampton county, in a statutory proceeding to test the validity of a will. Judgment for proponents. Contestants assign error.

*Affirmed.*

The opinion states the case.

*A. W. Patterson, Mears & Mears*, and *S. James Turlington*, for the plaintiffs in error.

*Old & Brockenbrough, Jas. G. Martin & Bro.*, and *John E. Nottingham*, for the defendants in error.

Prentis, J., delivered the opinion of the court.

The plaintiffs in error, who are among the heirs-at-law of their uncle, James C. Core, deceased, complain of a verdict and judgment in a statutory proceeding to test the validity of a paper writing which had been admitted to probate as the last will and testament of the said James C. Core, deceased, by the clerk of the Circuit Court of Northampton county. The case has

been elaborately argued and many precedents have
been cited, but it presents no new question. A careful
analysis of the record shows that there are but two
debatable questions—one a question of law and the
other a question of fact.

1. The question of law was raised by exceptions to
the exclusion of testimony, as well as by instructions
given and refused. A recital of some of the circum-
stances is necessary in order to understand this issue.

The decedent, who was between seventy-eight and
eighty years of age, had in his later years and specifi-
cally, as the sole beneficiary under his sister's will, be-
come the owner of a large estate. He was unmarried,
and after his sister's death lived at his home in the
country, without the care of any near relative. He
was penurious, and lived without many comforts which
his means should have enabled him to secure. He had
one brother, William T. Core, who was seven or eight
years older than himself, and his other nearest relatives
were three nieces, who were daughters of his brother,
two of whom were married and one unmarried; and
two nephews, sons of Bovee D. Core, a deceased
brother, who are the plaintiffs in error. The will is in
his own handwriting, dated September 2, 1920, and he
died about fourteen months thereafter, November 6,
1921.

This will reads:

"I James C. Core do hereby make this my last will
and Testmt. I leve to my neice Mollie A. Core twelve
thousand dollars.

"To my niece Juliet Core Blanchard five thousand
dollars.

"To my niece Grace Core Pegues five thousand
dollars.

"To my nephew Christopher Walthal Core five
thousand dollars.

"My nephew John Thomas Core five thousand dollars.

"To my nephew Dr. William Core Duffy five thousand dollars.

"To nephew John Core Duffy five thousand dollars.

"To my great niece Marie Core Duffy two thousand dollars.

"To my cousin Margaret Duncan Scott one thousand dollars.

"To my cousin Emma Duncan Powel one thousand dollars.

"To my cousin Corda Duncan Rowley one thousand dollars.

"To my Lower Northampton Baptist Church one thousand dollars.

"The balance of my estate both real and personal to my brother William T. Core after all my just debts are paid and funeral expenses are paid.

"This is my last will and testament written by my own hand this day September 2, 1920.

"JAMES C. CORE,<br>"Northampton Co., Va."

The contestants allege that the testator was without testamentary capacity, claiming that at the time it was written he was in the last stages of progressive senility, and that it was induced by the fraud and undue influence of his brother, William T. Core, and his niece, Mollie A. Core.

[1] In support of the contention that the will had been so procured by fraud and undue influence of his brother, William T. Core (Tom Core), aided and abetted by his daughter, Mollie A. Core, the contestants several times undertook to introduce the declarations of the testator as tending to show such fraud and undue influence. Examples of this are found in several cer-

tificates of exceptions. The witness Hamilton was asked: "Did you hear Mr. James C. Core, at the time you were there in July, 1920, make a statement about his brother, Tom Core?" The court, upon objection by the proponents, refused to allow the question to be answered, to which ruling the contestants excepted, and stated that the answer expected was, that "he had heard James C. Core say that his brother, Tom Core, had been trying to get him to make a will and cut his brother Bovee's children out, and that he didn't want to do it, and didn't think it was right, and brother Tom Core was all the time after him about his money; he worried him to death; his visits were no pleasure to him, because he was nagging at him about money all the time." This question was propounded to the witness Charnock: "In the year 1920, did you hear him say anything about his brother, Tom Core?" Upon an adverse ruling by the court, it was stated that the answer expected was, "that he told witness that brother Tom had been over there and got him to will a lot of his property to him and his folks, but he had some left. The brother Tom referred to was his brother, William T. Core, who lived in Norfolk." The court disallowed this question, propounded to the witness Robert Jones: "Did he say anything about Mr. Tom Core, his brother?" The answer expected was, "that he wanted to divide his property equally between Bovee's children and his other relatives, but his brother, Tom Core, wouldn't let him do it, and persuaded him not to do it, and kept on insisting on him not doing it." The witness R. L. Travis was also offered to prove similar declarations amplified and in greater detail.

The court very clearly indicated its view as to this class of evidence; and in certificate of exception No. 4, referring to certain similar testimony of the witness C. F. Wilson, it is thus expressed:

"The court: The ruling of the court is that so much of the testimony as purports to relate to declarations made by the deceased as to efforts of his brother to induce him or persuade him to make a will in the manner that he desired will be excluded. The other portion of the testimony will be admitted."

Then and repeatedly during the trial it was made plain that the court would admit all testimony tending to show testamentary incapacity, intention and mental attitude towards all of his relations, and a mass of such evidence was admitted.

These exceptions present a question which has been much debated, and a full discussion would require an elaborate review of the authorities. This, however, has been so often and so well done by others, that it is unnecessary to do more than to state the rule which is applied in this jurisdiction, and to show that this accords with the prevailing view.

[2] In *Wallen* v. *Wallen*, 107 Va. 131, 57 S. E. 596, the question was clearly presented, and it is there held that "declarations of the testator, not made contemporaneously with the execution of his will, are relevant evidence to show his feelings, his affections toward the natural objects of his bounty, his mental condition, as reflecting upon his testamentary capacity, but are not admissible to establish the substantive fact of undue influence."

There is a discriminating discussion of the subject in 3 Wigmore on Evidence (2d ed.). As illustrating this prevailing rule, it is in section 1738 said: "The testator's assertion that a person named, or unnamed, has procured him by fraud or by pressure to execute a will, or to insert a provision, is plainly obnoxious to the hearsay rule, if offered as evidence that the fact asserted did occur."

In *Shailer* v. *Bumstead*, 99 Mass. 122, it is said of

such declarations that by the better reason and most authoritative discussions they are not admissible to establish the fact of fraud and undue influence as one of the constituent elements of the issue. "When used for such purpose, they are mere hearsay, which by reason of the death of the party whose statements are so offered, can never be explained or contradicted by him. Obtained, it may be, by deception or persuasion, and always liable to the infirmities of human recollection, their admission for such purpose would go far to destroy the security which it is essential to preserve." In that case it is held, therefore, that they are thus inadmissible, so far as they form "a declaration or narrative to show the fact of fraud or undue influence at a previous period."

Mr. Wigmore cites many cases to establish the fact that by most courts such declarations are regarded as inadmissible.

[3] The distinction between what is admissible to show mental capacity of the testator, and statements made by him offered to show the substantive fact of undue influence, is in practice sometimes exceedingly difficult to apply. This is well illustrated by this language from *Rusling* v. *Rusling*, 36 N. J. Eq. 607 (in which such declarations were excluded): "When undue influence is set up in impeachment of a will, the ground of the invalidity to be established is, that the conduct of others has so operated upon testator's mind as to constrain him to execute an instrument to which, of his free will, he would not have assented. This involves two things: First, the conduct of those by whom the influence is said to have been exerted; second, the mental state of the testator, as produced by such conduct, which may require a disclosure of the strength of mind of the decedent and his testamentary purposes, both immediately before the conduct complained of

and while subjected to its influence.  In order to show the testator's mental state at any given time, declarations at that time are competent because the conditions of mind are revealed to us only by its external manifestations, of which speech is one.  Likewise, the state of mind at one time is competent evidence of its state at other times not too remote, because mental conditions have some degree of permanency.  Hence, in an inquiry respecting the testator's state of mind before or pending the exertion of the alleged influence, his words as well as his other behavior may be shown for the purpose of bringing into view the mental condition which produced them, and through that the antecedent and subsequent conditions.  To this extent his declarations have legal value.  But for the purpose of proving matters not relating to his existing mental state, the assertions of the testator are mere hearsay.  They cannot be regarded as evidence of previous occurrences, unless they come within one of the recognized exceptions to the rule excluding hearsay testimony.''

In *Smith* v. *Keller*, 205 N. Y. 46, 98 N. H. 214, 216, the court was evidently dealing with a question quite similar to that here involved, for it said this:  "Evidence of acts and conversation of a deceased bearing upon her mental strength is not incompetent simply because it bears upon some question other than that of mental strength of the deceased.  The difficulty in this case is that counsel for the plaintiff taking advantage of a rule correctly stated by the court, proceeded to call many witnesses and from them to elicit testimony bearing in a very slight degree, if at all, on the question of the mental strength of the testatrix; but in that way he obtained a large number of declarations by her subsequent to the date of the will which were well calculated to influence the jury and which doubtless did influence the jury to determine the question submitted

to it, as to whether the will was the free and voluntary act of the testatrix  *  *. Questions to elicit the mental strength of the testator should be asked for that purpose and not for an incompetent and improper purpose  *  *. Is it not perfectly clear that counsel for the plaintiff asked questions calling for particular conversations for the express purpose of getting before the jury statements of fact that might affect them in determining whether the will was the result of coercion and duress? Efforts to obtain from witnesses conversations, including improper and incompetent statements of fact, under the guise of showing the mental strength of the testatrix, should be and are condemned. And where, as in this case, such effort has been repeated and continuous, and the evidence is to a large extent relied upon to show undue influence, and is not a mere incident in the receipt of evidence for a proper purpose, it requires that the judgment should be reversed."

[4] It is not meant to suggest that the attorneys here sought by indirection to get this class of evidence before the jury, because such an intimation would be untrue. In seeking to introduce this testimony, they frankly and avowedly sought to introduce it and they rely upon it for the purpose of showing the substantive fact of fraud and undue influence alleged to have been exercised by William T. Core over his brother, the testator, for they offered no other testimony on this issue. The court was right in holding that for this purpose it was inadmissible. That was all the court intended to exclude and the ruling was in fact so limited. Now it is true that some parts of these statements which were offered tended in some measure to indicate the mental attitude of James C. Core, as well as his testamentary purposes, and if the statements of this character had been separable and separated from those statements tending to show the substantive fact of undue influence,

they would have been admissible as indicating mental attitude and intention.   No effort, however, was made to separate the admissible from the inadmissible.   Such parts of it as were admissible were mainly cumulative. Its tendency, however, if not its direct purpose, was to prove the fact of undue influence.   For this it was both inadmissible and insufficient.

[5] 2. The question of fact, above referred to, is whether or not, at the time of the execution of this will, James C. Core was mentally competent to make a will. The testimony as to this is voluminous and sharply conflicting.   If the jury had implicitly credited all of this testimony introduced and relied on by the contestants, they would have rendered a different verdict; but it is not surprising that they decided this question of fact in favor of the proponents of the will.   The will itself, of which there is a photographic copy on the printed record, contains no indication of any confusion of thought.   With the exception of the legacy to the church, as to which he had previously expressed his purpose, the will names as beneficiaries all of his nearest relations—his brother, his nephews, his nieces and his cousins.   He was a voluminous letter writer, and there are many letters in the record which indicate a mind of sufficient capacity to dispose of his property by will.   In 1918, after his sister's death, alluding to her having given him all her property, he wrote to his brother that he thought that she expected that he (William T. Core) would get most of that property through him (James C. Core) at his death, and that he (the testator) at that time thought so also.   After that and before he executed the will here in controversy, he had executed a will giving all of his property to his brother.   He had then no idea of giving these contestants, his nephews, any part of his estate, and so expressed himself.   One of them showed him some at-

tention, and thereafter he frequently expressed more kindly feelings toward both. In discussing his will with his attorney, Mr. William W. Old, in July, 1920, a few months before the date of the will, September 2, 1920, he laughingly said: "Colonel, what do you think about leaving my nephews in Richmond something, about $1,000.00 or so?" And Colonel Old thinks he replied: "Mr. Core, it would be a very nice thing for you to do, I think, but don't leave them a small amount like that, leave them something more." And the testator said, "Well, I think I will. But I am afraid that Christopher will throw his away." In this will subsequently executed he gives them each $5,000.00.

There is, then, nothing in the will itself which is contrary to the testator's previously expressed purposes, or to natural justice, and nothing to indicate mental aberration.

The medical testimony is also conflicting. While physicians who had attended the testator professionally for many years expressed the opinion that because of senile dementia he was not capable of making a will, on the contrary the physician who attended him subsequently and immediately after the execution of the will, in September and October, 1920, is of opinion that he then had testamentary capacity. The verdict of the jury sustaining the will, then, is well supported by evidence and is not surprising; but whether there be room for difference of opinion about this or not, it is conclusive.

There are several other assignments of error, to which we should doubtless refer.

[6, 7] One is, that before the jury were sworn it was suggested to the trial court judge that one of the talesmen was a brother of one of the witnesses in the case; whereupon the court, of its own motion, ordered this talesman to stand aside and had another one of the

panel to take his place in the jury box. This was a case in which the credibility of the witnesses was to be determined by the jury, and the action of the court was both proper and commendable; for it is of the highest consequence, not only that jurors should be absolutely impartial, but above suspicion. It is always the duty of the trial court to secure a fair jury and to avoid, if possible, any suspicion of unfairness. If the case of *Montague* v. *Commonwealth*, 10 Gratt. (51 Va.) 767, is to be construed as contrary to this view (which is doubtful), it must be considered as overruled by the later cases. *Fishburne* v. *Com'th*, 103 Va. 1023, 50 S. E. 443; *Seymour* v. *Commonwealth*, 133 Va. 775, 112 S. E. 806.

[8] There is an exception, because the court refused to permit a witness to relate that on one occasion the testator accused the witness and his brother of having stolen his wood, when they had not taken his wood, and some words passed between them. We think that if this evidence was offered to show insane delusions, and had been properly supported, it should have been admitted; but it occurred more than six months after the date of the will, and the testator's mental condition at that time was not decisive of his previous condition. Counsel did not indicate how they proposed to follow this evidence up, or what the purpose was in introducing it, and the court excluded it, saying that the contestants had no means of showing that the accusation was false or misplaced, or for that reason unusual. If the contestants were prepared to show that the judge was mistaken about this, that was the time to tender the additional evidence, which might possibly have tended to show that the testator's idea was an insane delusion. In any event, we will not hold this to be reversible error under the circumstances of this case.

It is complained that the court erred in refusing to

give an instruction offered by the contestants upon the subject of undue influence, and that at the instance of the proponents of the will it instructed the jury "that there is no evidence to support the charge of undue influence in this case, so that the question of undue influence is eliminated from this case."

We are clear in our view that the court held correctly as to this. To have suggested that they could have found, under the testimony submitted, that any fraud had been committed by William Thomas Core, or that any undue influence or coercion had been exerted by him, or by Mollie T. Core, to induce this will, would have been clearly erroneous. There is nothing in the evidence upon which such an instruction could be fairly based, and if a verdict founded upon that idea had been returned, it would have been unsupported by and contrary to the evidence. *Huff* v. *Welch*, 115 Va. 74, 78 S. E. 573; *Lester* v. *Simpkins*, 117 Va. 55, 83 S. E. 1062.

[9, 10] Reviewing the whole record, even if all of the evidence which was excluded had been admitted and all of the rejected instructions offered by the defendants had been given, the result should have been the same, for upon this issue, if submitted, there could have been but one proper verdict. Fraud and undue influence are never presumed. The burden of showing undue influence rests upon those who allege it, and it cannot be based upon bare suggestion, innuendo, or suspicion. The undue influence which will vitiate a will must be of such a character as to control the mind and direct the action of the testator. Conceding the truth of all of the testimony which was offered, it falls far short of showing that this old man, William Thomas Core, about eight years older than the testator, and who died four months earlier, directed, fraudulently controlled, or improperly influenced the testator in the final disposition of his estate under this will.

The other assignments present no doubtful question. The jury were sufficiently instructed as to the capacity of the mind which is necessary to enable one to make a valid will, and there is no reason to suppose that they did not fully comprehend the only question of fact which they had to consider and determine.

*Affirmed.*

SIMS, P., dissenting:

Certificate of exceptions No. 7 in the record before us shows the following:

"In the examination of R. L. Travis, witness for the contestants, upon direct examination by the contestants, the following questions were asked witness, and the following answers given:

"(The jury being excluded.)

"Q. Did he ask you to look for any paper after Mr. Tom Core and Miss Mollie Core left, following your return?

"A. Yes, sir; the first thing Mr. Core said to me was something about his will.

"By the court:

"Q. Tell what he said and not something about his will, but what he said to you?

"A. He said: 'Well, I hope them Norfolk folks are satisfied—brother Tom. They have got me to make my will.' I said, 'That is so, Mr. Core?' He said: 'Yes, sir.' I asked him what he had done and he told me.

"By Mr. Martin:

"Q. What did he tell you?

"A. He said: 'Well, brother Tom got me to make my will and I don't know whether he fixed it like I wanted it or not. He says he has.' I said: 'How has

he fixed it, Mr. Core?' He said: 'Well, I left Mollie $12,000.00 and Grace $5,000.00 and Miss Julia $5,000.00 and Bovee's two boys $5,000.00 apiece, and he said: "You want me to have some, Jimmie, you left me out; you want me to have some, doesn't you?" ' He said: 'Brother Tom, yes; I want you to have some.' He said: 'How can I fix it?' He said: 'You just give me the remainder.' I said: 'Mr. Core, you have got it all.' He said: 'It is all equally divided.' I said: 'Equally divided? That is not equal. I suppose you are worth about $350,000.00,' and I taken my pencil and figured up what he told me and I said: 'That is about $35,000.00 or $40,000.00 and brother Tom comes in and gets the other. He has got it all.' He said: 'You think brother Tom is treating me like that?' I said: 'I don't know. From what you say, he has.' He said: 'You look and see if you can find my will. If that is what it is, I want to tear it up.' He said: 'What can I do about it?' I said: 'I don't know, Mr. Core. You can get it and tear it up.' He said: 'You look and get it and tear it up. They said they put it in my box.' There was some basket he had behind his bed and I went around there and looked for it and I couldn't find no will, and that was about all he said along that line, except brother Tom had treated him mighty bad to take advantage of him like that, and he said something else the next day when I went out there about it. For one or two days, he was talking about it and wanted me to go over the next morning or the next day and get Robert Jones, as well as I could remember, and tell him to come over there and be a witness, that it was against his wishes, that he didn't want it that way. I said: 'Mr. Core, that won't amount to nothing,' and he did say something when he was talking about it, when he was strong enough to he would try to write him another one and he said: 'If I get strong enough,

I can write another one, can't I?' I said: 'Yes; Mr. Core, if you get strong enough you can write another one.' He was right weak and couldn't do much, so he was betting on writing another will in a day or two, but he kept getting worse and worse and then he told me to get Robert Jones after that. I said: 'That won't amount to nothing, Mr. Core, to do that.' He said: 'One thing I want you to promise me. If they ever fight, which I know they will, you tell it to the court that the will is not made like I want it. I want Bovee's children to come on equal. Brother Tom hasn't done me right.' I said: 'Not if you want it divided equally,' but he said: 'Brother Tom told me he had done that.'

"By Mr. Turlington:

"Q. Did he tell you anything about writing the will?'

"A. He told me the first day I went out there, that Miss Mollie wrote the will, and he copied it.

"And proponents objected to said questions and answers, and the evidence was excluded by the court, and the contestants excepted."

In the testimony wholly excluded, as shown by this bill of exceptions, there was evidence of the most cogent character, if the witness was to be believed (which was solely for the jury), of declarations of the testator tending to show his mental condition or capacity, and his feelings of affection, independently of the bearing of such evidence on the substantive fact of undue influence.

I can but feel that so much of this testimony as bore upon the question of the mental condition or capacity and the feelings of affection of the testator should have been admitted for the consideration of the jury. In view of the sharp conflict in the testimony on the question of the mental capacity of the testator to make a will at the time the will in suit was executed, it seems

to me that, if such testimony had been admitted and had been credited by the jury, they would have been fully warranted in bringing in a verdict against the validity of the will. That being so, the contestants were entitled to have such testimony admitted. Whereas, notwithstanding the ruling of the learned trial judge at another stage of the trial, to the effect that he would admit in evidence any testimony tending to show declarations such as are here under consideration, the court, in the instance here being dealt with, excluded all of such testimony. The actual action of the court in this important instance was not in accord with its purpose declared at another stage of the trial.

As said and held in *Wallen* v. *Wallen*, 107 Va. 131, at p. 155 (57 S. E. 596, 600): "The principle established seems to be that declarations of the testator are admissible to show his mental condition or capacity, as well as his feelings of affection,   *   *   *."

Therefore, without entering upon the consideration of any of the other errors assigned, I feel that it was error and harmful error for the court to have excluded all of the testimony shown by the bill of exceptions mentioned and that the case should be reversed and a new trial awarded.