# Richmond.

## WARNER JENKINS, ET ALS., V. A. J. HOGG, ET ALS.

### September 25, 1924.

1. SHELLEY'S CASE (RULE IN)—*Abolition—Case at Bar.*—The rule in *Shelley's Case* was abolished by statute in 1850, but, as in the instant case, the will in question was probated in 1833, if the facts of the case are appropriate, the rule in *Shelley's Case* applies.

2. SHELLEY'S CASE (RULE IN)—*General Statement of the Rule.*—Whenever the ancestor, by any will, gift, or conveyance, takes an estate of freehold in lands, or tenements, and in the same will, gift, or conveyance, an estate is afterwards limited by way of remainder, either mediately or immediately to his heirs, or to the heirs of his body, the words "heirs" or "heirs of his body" are words of limitation of the estate, carrying the inheritance to the ancestor, and not words of purchase, creating a contingent remainder in the heirs.

3. SHELLEY'S CASE (RULE IN)—*Limitation to Heirs or Heirs of the Body—No Qualifying or Explanatory Words—Words Taken in their Technical Sense.*—In all cases in which the limitation in remainder is to the heirs of the body of the life tenant, without qualification or explanation, those words are deemed to be words of limitation; and where the limitation was in its simplest form, as to A for life and remainder to the heirs of his body, the rule in *Shelley's Case* would always operate at common law to give A a fee tail. The words "heirs of the body," as well as the word "heirs" alone, are to be taken and used in their technical sense; and this presumption can be overcome only by qualifying or explanatory words or phrases indicating with a fair degree of clearness that the author of the instrument did not intend to use them as words of limitation.

4. SHELLEY'S CASE (RULE IN)—*A Rule of Property.*—The rule in *Shelley's Case* is a rule of property and overrides the intention of the testator. In fact, wherever applicable it may be said that it disregards intention altogether; for, whilst the intention may confessedly have been but to give a life estate, the rule converts that life estate into a fee by treating the terms of the gift over to the heirs as a limitation of the estate, and not as words of purchase.

5. SHELLEY'S CASE (RULE IN)—*Rule of Property—Intention of the Testator.*—While the rule in *Shelley's Case* is paramount to the intention of the testator, this does not mean that a person may not give

to another an estate for life, with a remainder over to persons designated as heirs, or heirs of the body, if it be fairly clear from the instrument in which the limitation occurs that by the words "heirs," or "heirs of the body," the author of the instrument intended to use them merely as *descriptio personarum*, and not as words denoting persons who are to take indefinitely in succession by descent.

6. SHELLEY'S CASE (RULE IN)—*Rule of Property—Intention of the Testator.*—What is really meant by the rule being paramount to the intention of the testator is, for example, that where the rule is applicable it overrides the plainly expressed intention of the testator to give to the first taker only a life estate, and therefore the rule overrides the intention of the testator, and disregards altogether the intention expressed upon the very face of the instrument that the first taker should take only a life estate.

7. SHELLEY'S CASE (RULE IN)—*Rule of Property—Intention of the Testator—Superadded Words.*—Where, following the grant of a life estate and the limitation over to heirs, or heirs of the body, there are subsequent words, the operation of the rule is made to stand aside until the intention of the testator is ascertained; that is, whether or not he intended that the words "heirs" or "heirs of the body" should be taken as words in their technical sense, or whether it was to be gathered from the entire instrument that he did not intend the words to be taken in their technical meaning.

8. SHELLEY'S CASE (RULE IN)—*Essentials to the Application of the Rule.*— The following circumstances must concur in order that the rule in *Shelley's Case* may be applicable: (1) The limitation to the heirs, etc., must be such as would ordinarily create a valid contingent remainder in the heirs at common law; (2) the limitation must be to the heirs, etc., of the tenant of the preceding estate and of no other person; (3) the particular estate and that to the heirs must be of the same quality, that is, both legal or both equitable; (4) the words "heirs, etc.," must be used in the technical sense as importing an indefinite succession of heirs, etc.

9. WILLS—*Construction—Effect Given to all Words.*—All the words of a will should, if possible, be given some effect.

10. SHELLEY'S CASE (RULE IN)—*Superadded Words—Devise to First Takers with Gift Over to "their Heirs Lawfully Begotten of their Bodies."*—In the instant case a will probated in 1833 provided that a portion of testator's real estate should be divided equally between his four children, "which I lend unto them during their natural life and give to their heirs lawfully begotten of their bodies, but should any one of my said children die leaving no child, it is my will that the portion of the child so dying may be equally divided between those that may survive or their heirs."

*Held:* That the words "heirs lawfully begotten of their bodies" was

not used by the testator in their legal and technical sense, but as descriptive of a certain class, and that the rule in *Shelley's Case* did not apply to this devise.

Writ of error to a judgment of the Circuit Court of Gloucester county, rendered in favor of the defendants.

*Affirmed.*

The opinion states the case.

*C. S. Smith, Jr.,* for the plaintiffs in error.

*C. G. Jones* and *J. D. Hank, Jr.,* for the defendants in error.

CRUMP, P., delivered the opinion of the court.

The plaintiffs in error were the plaintiffs in an action of ejectment pending in the Circuit Court of Gloucester county against the present defendants in error. The case was submitted to the court without a jury and judgment was rendered for the defendants. Thereupon the plaintiffs, who are now the plaintiffs in error here, obtained a writ of error from the Supreme Court of Appeals.

The sole question for decision by this court is as to the proper construction of the will of John Dobson, admitted to probate in Gloucester county in December, 1833. The trial court held that under the terms of the devise in that will, under which the plaintiffs in the action of ejectment claimed, a life estate was given to the devisee as the first taker, and overruled the contention of the defendants that under the rule in *Shelley's Case* the estate of the first taker was converted into an estate in fee. This appeal presents for decision by this court the question whether or not the devise contained

in the will of John Dobson is governed by the rule in *Shelley's Case.* If such be the case, the court below erred; otherwise, it was not in error.

[1] It will be remembered that the rule in *Shelley's Case* was abolished by statute in 1850; but, as this will was probated in 1833, if the facts of the case are appropriate, the rule in *Shelley's Case* would apply to it.

The testator in his will, after providing for his wife and for the education of a minor child, gave a portion of his real estate to his four children in the following language:

"* * may be equally divided between my four children, Rebecca Dobson, Martha Anna Dobson, Mary Frances Dobson, Joseph Dobson, which I lend unto them during their natural life and give to their heirs lawfully begotten of their bodies, but should any one of my said children die leaving no child, it is my will that the portion of the child so dying may be equally divided between those that may survive or their heirs."

It is earnestly contended by learned counsel for the plaintiffs in error that under the rule in *Shelley's Case* the limitation immediately following the life estate, "to their heirs lawfully begotten of their bodies," creates a fee tail in the four children named as first takers, which under our statute is converted into a fee simple; and that the words immediately following are not sufficient to modify the words "heirs lawfully begotten of their bodies" so as to preclude the operation of the rule.

Notwithstanding the antiquity of this famous rule, and despite the fact that its operation in Virginia was abrogated in 1850, somewhat strange to say, it has been the subject of three decisions of the Supreme Court of Appeals of Virginia within the last ten years.

Where an estate was conveyed to A for life with remainder to the heirs, or heirs of the body, of A, it was

universally held, under the settled recognition of the rule in *Shelley's Case*, that notwithstanding the express grant to A only for life, A took in one case a fee simple estate and in the other case an estate in fee tail.

[2] The precise terms of the rule, comprehensively stated, are given by Professor Minor as follows:

"Whenever the ancestor by any will, gift, or conveyance, takes an estate of freehold in lands, or tenements, and in the same will, gift, or conveyance, an estate is afterwards limited by way of remainder, either mediately or immediately to his heirs, or to the heirs of his body, the words heirs or heirs of his body are words of limitation of the estate, carrying the inheritance to the ancestor, and not words of purchase creating a contingent remainder in the heirs."

[3] Under the will involved in this case, it is apparent that, omitting the words following the devise to the prior tenants and then to the heirs lawfully begotten of their bodies, the will in question here is brought within the operation of the rule; and the four children would take an estate in fee. In all cases in which the limitation in remainder is to the heirs of the body of the life tenant, without qualification or explanation, those words are deemed to be words of limitation; and where the limitation was in its simplest form, as to A for life and remainder to the heirs of his body, the rule in *Shelley's Case* would always operate at common law to give A a fee tail. It is well settled in addition, that the words "heirs of the body," as well as the word "heirs" alone, are to be taken and used in their technical sense; and this presumption can be overcome only by qualifying or explanatory words or phrases indicating with a fair degree of clearness that the author of the instrument did not intend to use them as words of limitation.

[4] It is to be taken as well settled in our law that the

rule in *Shelley's Case* is a rule of property and overrides the intention of the testator. In fact, wherever applicable it may be said that it disregards intention altogether; for whilst the intention may confessedly have been but to give a life estate, the rule converts that life estate into a fee by treating the terms of the gift over to the heirs as a limitation of the estate and not as words of purchase.

At common law originally, where an estate was conveyed to A for life with remainder to the heirs or heirs of the body of A, construed strictly according to the exact meaning of the words, A would take only an estate for life, and the words "heirs" or "heirs of the body of A" would have been construed as words of purchase giving a contingent remainder to the heirs or heirs of the body of A. This result was attended with numerous inconveniences in early times when the land holdings in England and the law of descent of real property were greatly influenced by the feudal law. For this reason the courts in England held that the limitation to the heirs or the heirs of the body should be regarded as executed in possession and thus merged with the life estate in the ancestor, so that the ancestor stood seized of an estate in fee simple or of fee tail in possession.

[5-7] While it is stated that the rule in *Shelley's Case* is paramount to the intention of the testator, and thus overrides the expressed intention of the testator that the first taker should have only a life estate, this principle must be understood in its proper sense. The law does not mean to say that a person may not give to another an estate for life with a remainder over to persons designated as heirs, or heirs of the body, if it be fairly clear from the instrument in which the limitation occurs that by the words "heirs," or "heirs of the body," the author of the instrument intended to use them

merely as *descriptio personarum*, and not as words denoting persons who are to take indefinitely in succession by descent. What is really meant by the rule being paramount to the intention of the testator is, for example, that where the rule is applicable it overrides the plainly expressed intention of the testator to give to the first taker only a life estate, and therefore the rule overrides the intention of the testator and disregards altogether the intention expressed upon the very face of the instrument that the first taker should take only a life estate. However, where, following the grant of a life estate and the limitation over to heirs, or heirs of the body, there are subsequent words, the operation of the rule is made to stand aside until the intention of the testator is ascertained; that is, whether or not he intended that the words heirs, or heirs of the body, should be taken as words in their technical sense, or whether it was to be gathered from the entire instrument that he did not intend the words to be taken in their technical meaning.

In a note at page 299 of 2 Lomax's Digest, this is expressed by an ancient writer somewhat quaintly as follows:

"The rule does not assume to fix or shackle the meaning of words. It strikes at the intention when discovered, but it furnishes no touchstone for trying the import of the limitations. That is entirely without the province of the rule, and is left to the uncontrolled operation of general principles. On the one hand the word *heirs*, though properly a word of limitation, will not by its magic attract the rule, if it be clearly used as a substitute term for sons or children, etc. On the other hand, the words *sons*, *children*, etc., though properly words of purchase, will not repel the rule, if they be clearly used as substitute terms for heirs. The rule

wars not with words; it leaves to the common rules of exposition the task of working out the meaning, and stands aloof till they have performed their office."

[8] In 2 Minor on Real Property, at section 754, Professor Raleigh Minor states the following essentials for the application of the rule:

"The following circumstances must concur in order that the rule in *Shelley's Case* may be applicable: (1) The limitation to the heirs, etc., must be such as would ordinarily create a valid contingent remainder in the heirs at common law; (2) the limitation must be to the heirs, etc., of the tenant of the preceding estate and of no other person; (3) the particular estate and that to the heirs must be of the same quality, that is, both legal or both equitable; (4) the words 'heirs, etc.,' must be used in the technical sense as importing an indefinite succession of heirs, etc."

The first three of these requisites are presented in the instant case. The real question for decision here is whether or not the words "heirs lawfully begotten of their bodies" were used by the testator in their technical sense, that is, as importing an indefinite succession of heirs, in which event they would be words of limitation; or whether, on the other hand, the testator has sufficiently expressed his intention to show that in using these technical terms he had in mind the children of the first takers as the named class of persons who were to take upon the death of the life tenants, in which event, these words should be taken as words of purchase and not as words importing an indefinite succession of heirs, and in that case these words, notwithstanding their technical import, are to be construed as words of purchase. And in the determination of this question proper effect should be given to the general principles already stated.

What did the testator mean by adding, immediately after the technical words stated, the following: "But should any one of my said children die leaving no child, it is my will that the portion of the child so dying may be equally divided between those that may survive or their heirs?"

It was contended by learned counsel on each side that there were decisions in Virginia practically decisive of this question in favor of each of the contending parties here.   Upon examination of the authorities we are convinced that the exact question involved in this case, that is, the meaning of the identical language used here, has never been before an appellate tribunal in Virginia.

The latest case is that of *Turner* v. *Monteiro*, 127 Va. 537, 103 S. E. 572, 13 A. L. R. 383.   The limitation under construction in that case was, after giving a life estate to Henry and Aristides, two of the sons of the testator, in the following language: "And after the death of the last of the two, to their descendants, if they have any, if not, to my son Archimides or his descendants I give the above mentioned property without restriction."

The court held that while the word "descendants" is not a technical word, yet it is a word much used in law and of a very clear and definite meaning.   The court said that a descendant is an individual proceeding from an ancestor in any degree, that it is synonymous with issue, that it means offspring near or remote.   The court further held that the word "child" was not synonymous with the word "descendant;" though a child is a descendant in one sense, it is still only in the nearest degree, and not a descendant of the ancestor in the remotest as well as the nearest degree as descendant ordinarily means.   The court very properly held that the word "descendants" as used in that case did not mean chil-

dren, but was equivalent to heirs or issue, and therefore constituted words of limitation and not of purchase.

As was stated by the court on page 548 (103 S. E. 575): "The rule in *Shelley's Case*, where the requisites concur, controls the intention of the testator or grantor and overrides his purpose, often very clearly expressed, to limit the ancestor to an estate of freehold. As stated by Mr. Minor, the rule is not a means to discover the intent of the grantor, or testator, but supposing the intent ascertained the rule controls it. But, as pointed out, the rule does not apply unless the words of limitation over include the whole line of possible recipients in indefinite succession. If the word 'descendants' is interpreted as the words 'heirs of the body' or 'issue' have been interpreted it includes the posterity of Aristides in indefinite succession. In that event, it is immaterial that the testator intended to limit the ancestor to a life estate, for the law operating through the rule in *Shelley's Case* takes charge of the situation, and carries the inheritance to the ancestor."

Also, on page 547 (103 S. E. 575), the court says: "The words 'descendants' and 'heirs of the body' are of equivalent meaning. It is, of course, essential to the application of the rule that the word or words used in the limitation over import a class of persons who take indefinitely in succession. Any words of superadded limitation, showing that the words used are intended to designate particular persons, will defeat the rule."

Having reached the conclusion that the word "descendant" used in that case was equivalent to "heirs of the body" or "issue," the court naturally held that the rule was applicable to the limitation there and the first taker took an estate in fee. The exact question decided in that case has but little if any bearing upon the instant case.

In the case of *Halsey* v. *Fulton*, 119 Va. 571, 89 S. E. 912, the court had under consideration a deed in which a tract of land was conveyed by the grantor, S. M. Fulton, Sr., for the benefit of his wife for her life, and "the remainder to the heirs of her body begotten by the said S. M. Fulton, Sr." The court held that inasmuch as the words "heirs of her body" were qualified by the language "begotten by the said S. M. Fulton, Sr.," in a deed made by the latter for the benefit of a life tenant who was his wife, it was sufficiently manifest that the words "heirs of her body" meant the children of that husband and wife, and, therefore, were words of purchase and not of limitation. The court said:

"It is clear that if the limitation had in terms been to the children of S. M. Fulton, Sr., by his wife Mary C. Fulton, then W. G. Fulton (one of the children) would have taken a vested remainder. In such a case the fact that other children may be born before the remainderman actually comes into the enjoyment of his estate does not affect the vested character of his interest, but merely subjects it to the possibility of having to open out and let in those subsequently born. Nor, in such case, does the fact that so long as the mother lives there is always the possibility of the remainderman's death in advance of hers prevent him from taking that which in law is recognized as a vested remainder."

In holding that there was sufficient language used by the testator to show that he intended the words "heirs of her body" to be taken as children, the court says: "The intention, of course, is to be determined in each case by the language employed in the instrument. It is a well established general rule that terms having a fixed and definite technical import must be accorded their technical meaning. But the rule does not apply when in the same instrument qualifying expressions appear

which plainly indicate an intention to give such terms a different signification. The exception is as well settled as the rule itself, and under its influence the expression 'heirs' or 'heirs of the body' are frequently held to refer exclusively to children.''

The case of *Halsey* v. *Fulton* is more similar to the instant case than any of the cases brought to the attention of the court. Yet, we are still to consider the question whether the language following, ''heirs lawfully begotten of their bodies,'' in the instant case come within the exception referred to by the court under which ''heirs,'' or ''heirs of the body,'' are frequently held to refer exclusively to children.

In *King* v. *Johnson*, 117 Va. 69, 83 S. E. 1070, the devise was as follows: ''I give to my son Rufus all my real estate in the county of Westmoreland for and during his natural life, and should he die with a lawful heir, to his heir or heirs forever. But should he die without issue, I give the said land to my son Alexander S. King, to him and his heirs forever.''

In reference to the rule in *Shelley's Case*, the court says, on page 51 (83 S. E. 1071):

''The doctrine of that rule, so far as applicable to devises, was that whenever an ancestor by will takes an estate of freehold in lands or tenements, and in the same will an estate is afterwards limited by way of remainder either mediately or immediately to his heirs or heirs of his body, the words heirs, or heirs of his body, are words of limitation carrying the inheritance to the ancestor, and not words of purchase creating a contingent remainder in the heirs. Whether the devise in question comes within the operation of that rule depends upon whether the words of limitation over following the devise to Rufus, the ancestor included the whole line of the first taker's heirs in indefinite succession, or only

certain persons were intended to be described by the use of the words 'his heir or heirs forever.' If those words were used in their technical sense, the rule applies; but if they were used as a designation or description of particular persons who were to take as purchasers, in contradistinction to those who would take by inheritance, then the rule does not apply.''

The court held, briefly, that there was nothing in the will plainly showing that the words "his heir or heirs forever" were used in any other than their technical sense. This was clearly correct. Indeed, the only modifying language refers to the possibility of the life tenant dying without issue, showing that by the language, "heir or heirs forever," the testator had in mind issue or descendants, that is, all of the heirs of the first taker in indefinite succession.

In *Moore* v. *Brooks*, 12 Gratt. (53 Va.) 135, a very apposite discussion of the rule in *Shelley's Case*, as applied in Virginia, is found in the opinion delivered by Judge Allen, although two of the learned judges of the court dissented. The testator, whose will was before the court in that case, in leaving some of his estate to his children, expressed his desire as to two of his daughters in the following language: "And it is my express desire that the parts of my estate which shall go to my two daughters, Mary Murphy and Caroline Brooks, shall be held by them during their natural lives, and no longer, and then equally divided between their heirs lawfully begotten."

The limitation over to the heirs so expressed brought the devise unequivocally within the operation of the rule in *Shelley's Case*, unless the language "equally divided between their heirs" was held to sufficiently indicate an intention on the part of the testator to use the words "heirs lawfully begotten" as equivalent to chil-

dren or other words of purchase. The learned judge discusses this question with much learning. We rather conclude that the opinion was rendered necessary by the very learned and ingenious arguments of the eminent counsel who argued the case, rather than by the mere question presented to the court.

It had been held in England that a reference to an equal division between the heirs in a limitation of this character did not affect the result of the limitation. Judge Allen refers to several quite new Virginia cases in which it seems to be held otherwise. Doubtless those cases were decided under an inclination in very early times to deny the application of the rule in *Shelley's Case*, in the early Commonwealth of Virginia. It is shown in the opinion of Judge Allen that in the leading English case of *Jesson* v. *Wright*, the words "equally to be divided between them," added to technical words of limitation, did not deprive such words of their usual effect; and that the same ruling had been made in several recent cases in Virginia. Judge Allen says:

"This case brings again before the court the question, so often discussed here and in England, as to the operation of the rule in *Shelley's Case*, that where an estate in freehold is limited to a person, and the same instrument contains a limitation, mediate or immediate, to the heirs of his body or to his heirs, the ancestor takes the whole estate comprised in the terms either as a fee tail or a fee simple. In this case there is no limitation over on the failure of issue; and the only question arising on the will is whether the testator, in reference to the devise or bequest to his daughters, Mary Murphy and Caroline Brooks, used the words 'heirs lawfully begotten' in their legal, primary and proper sense, or whether he used them as descriptive of some other class of objects."

The court reached the conclusion that the words

"heirs lawfully begotten" were used by the testator in their legal and technical sense, and it seems to be evident that no other decision could have been reached.

Coming to the immediate matter in hand in this case, the question arising on the will here is also whether the testator, in reference to the devise to his four children, used the words "heirs lawfully begotten of their bodies" in their legal and technical sense, or whether he used them as descriptive of a certain class. That is, we are to determine what was the intention of the testator in using the language following the limitation, "but should any one of my said children die leaving no child, it is my will that the portion of the child so dying may be equally divided between those that may survive, or their heirs."

Taking all the language together, what is the natural conclusion as to what the author of this instrument had in mind at the time? This aspect of the case is to be considered and determined before we can say whether or not the rule in *Shelley's Case* should be given application here.

We see no reason why the modifying language in this case should not be given its ordinary and full effect. It is true that the language cannot deprive technical words altogether of their technical meaning unless they are words which are susceptible of another meaning and it is plain that the writer intended that they should be taken in that other signification. We think this is such a case.

An heir lawfully begotten of the body is necessarily confined to the legitimate child of a person, and therefore the language used in this case, while technical, is susceptible of that ordinary interpretation, and it is not unnatural that the language should have been used in this case in that sense. This was a joint devise to the

four children of the testator, showing that he wanted
them to take it jointly so far as his will was concerned;
and when he couples this joint devise with his express
desire that there should exist among the devisees, who
were his four children, a right of survivorship if any of
them died leaving no child, what could the testator have
meant unless we conclude that in using the words "law-
fully begotten of their bodies," he meant the children
lawfully born to them?

[9, 10] All the words of the will should, if possible, be
given some effect. The modifying words here clearly
serve to show that the testator, in mentioning the heirs
lawfully begotten of his children, was not giving to such
heirs an estate in indefinite succession. The modifying
language is entirely incompatible with any such con-
clusion. The testator had a right to leave his property
as he chose, and whether or not he was acquainted with
the rule in *Shelley's Case*, it seems to us fairly clear that
his intention was to give this property to his four chil-
dren, and that so long as they lived there should exist
among them the right of survivorship even to the last
surviving child, in the event that any one or more of the
four should die leaving no child; and that at the death
of all of them, or of the survivor, the property would go
to those who were the heirs of the survivors, or sur-
vivor, at the time of death, should any of them have
died previously leaving no children; and that if all of
them died in sequence, leaving children, those children
would take a remainder in fee.

Objection may be made to this construction, and has
been made in argument, that it may possibly cut out
grandchildren of the four persons taking the life estate.
However much speculation may be indulged in as to
the possibility of such a result, and as to what influence
that possibility may have had upon the mind of the tes-

tator, it may rather be said from a practical standpoint that the testator was not looking that far ahead, but that he meant and had in mind exactly what his language indicates.

The learned counsel for plaintiffs in error contends that in two cases—*Thomason* v. *Andersons*, 4 Leigh (31 Va.) 118, and *Jesson* v. *Wright*, an English case now reported in 10 Eng. Ruling Cases 714—as stated in his brief, "it was held that the application of the rule in *Shelley's Case* was not defeated because the testator made a disposition of his property in case the life tenant should die 'leaving no child,' as John Dobson did." We do not think either of these cases are of a character to make them controlling in the decision of the instant case.

In *Thomason* v. *Andersons*, the rule in *Shelley's Case* was not drawn in question at all. That case presented an instance of a devise of an express fee simple estate to the natural daughter of the testator, with an executory devise limited over to the children of the testator, if the natural daughter died leaving "no child," but to be heired by her children if she left any. Judge Carr says: "Did the testator mean to provide for his daughter and her issue indefinitely? If so, this is an estate tail, no matter how he may have expressed himself, or with what conditions or limitations he may have attempted to clog it. 'I give to my daughter 100 acres of land— to her and her heirs forever—my further will is, that if she should die leaving no child, the estate shall be divided among all my children—but should she leave any living child or children, the estate shall be *heired* by him, her or them, as the case may be.' Can any one look upon this clause and not perceive that the intention was to provide for the daughter and her whole line of descendants? When this intent is clear, the words

child or children are taken to mean *issue.* The children are to *heir* the estate, how? Surely through the mother; they cannot take as purchasers.''

Both Judge Carr and Judge Tucker, who also delivered an opinion in the case differing somewhat in method of reasoning from Judge Carr, discuss the question of an executory devise limited upon an express fee, such a devise being a limitation of a future interest not to take effect at the testator's death, but limited to arise and vest upon some future contingency. This case is not mentioned by Judge Allen, in *Moore* v. *Brooks,* in his review of the earlier Virginia cases involving the rule in *Shelley's Case,* and we do not think it is very pertinent to the question in the instant case.

In *Jesson* v. *Wright,* the syllabus is as follows:

''Devise—To W. (a natural son of the testator's sister) for life, and after his decease to the heirs of his body in such shares and proportion as W. by deed, etc., shall appoint; and for want of such appointment to heirs of the body of W. share and share alike as tenants in common; and if but one child the whole to such only child, and for want of such issue, to the heirs of the devisor.''

The case was decided in the House of Lords, and the Lord Chancellor, who delivered the leading opinion, as also the other judge who rendered an opinion, placed emphasis upon the language *want of such issue.* The former concludes: ''Upon the whole, I think it is clear that the testator intended that all the issue of William should fail before the estate should go over according to the final limitation.'' Lord Redesdale says: ''The words 'for want of such issue' are far from being sufficient to overrule the words 'heirs of the body.' They have almost constantly been construed to mean an indefinite failure of issue, and of themselves have frequently been held to give an estate tail. In this case

the words 'such issue' cannot be construed children, except by referring to the words 'heirs of the body,' and in referring to those words they show another intent."

We do not think it can be said that in *Jesson* v. *Wright* the rule in *Shelley's Case* was held applicable to the provisions of the will, notwithstanding that there was a limitation over if the life tenant should die leaving no child; the modifying clause was much wider in scope, and contained much other and pertinent language, showing that by *heirs of the body* the testator meant his issue indefinitely, and not his children.

It may be that a limitation over, after a gift to a tenant for life and then to his heirs, to a third person, conditioned solely upon the life tenant's dying leaving no child, with no further qualifying words throwing light upon the meaning of "heirs," would give rise to the application of the rule in *Shelley's Case.* But in the instant case every word of the modifying clause should be given effect, not for the purpose of qualifying the limitation, but in order to ascertain whether the testator, in using the words "heirs lawfully begotten of their bodies," meant the immediate children of his four children. It was quite plainly his intention to give his property to his four children jointly, in equal shares, for life, and after the death of each one this share to go to his child, or children, if he left any, and if a child died leaving no children, that share was to go to the surviving of the original four devisees; so that if one of the testator's children died leaving no child, the general heirs of the child so dying would not succeed to the deceased's share in the property. This is not a very unusual disposition of property, having for its object the keeping of the property beyond question in the testator's own family. The intention of the testator to so dispose of his estate was sufficiently expressed here.

This case was exhaustively argued on both sides, with copious citation of authorities by learned counsel. Our opinion, however, has been so extended as not to permit any further review of decided cases. Among the cases cited by counsel, we may merely refer to *Taylor* v. *Cleary*, 22 Gratt. (70 Va.) 448; *Walker* v. *Lewis*, 90 Va. 578, 19 S. E. 258; *Hall* v. *Smith*, 25 Gratt. (66 Va.) 70; *Hurt* v. *Brooks*, 89 Va. 496, 16 S. E. 358.

Upon the whole case, our opinion is, for the reasons above given, to affirm the judgment of the circuit court.

*Affirmed.*