# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## TUGMAN, BY ETC. V. RIVERSIDE AND DAN RIVER COTTON MILLS.

### March 18, 1926.

1. NEGLIGENCE—*Open and Obvious Danger—Child Under Three Years of Age—Case at Bar.*—The instant case was an action by an infant for injuries received from falling into a post hole filled with rain water, from which injuries it was alleged that she became an idiot. The infant was a member of the family of a tenant of defendant. Defendant's servants were digging the holes and placing concrete posts in them and left this hole unguarded and unprotected for twenty-four hours. The circumstances were such that the defendant must have known that its house was rented to tenants with families having children of all ages, and that the existence of such a hole in such a location would be a menace to the safety of children of tender years.

   *Held:* That the defense of obvious danger ought not to be sustained, as what would be an obvious danger to an adult would not be such to an infant under three years of age.

2. NEGLIGENCE—*Foreseeing Injury—Particular Injury Need not be Anticipated—Case at Bar.*—The instant case was an action against defendant for injuries to a child under three years of age, caused by falling into an unguarded post hole filled with rain water. The accident that happened was a very unusual one, but if men of ordinary care and prudence could have foreseen that leaving the hole unguarded was liable to result in injury to others, it is immaterial that the particular injury which followed was not reasonably to have been anticipated.

3. NEGLIGENCE—*Child Falling into Unguarded Post Hole—Landlord and Tenant—Case at Bar.*—The instant case was an action against defendant for injuries to a child caused by falling into an unguarded post-hole. The child was a member of the family of a tenant of defendant and defendant had dug and left the hole unguarded. The case is unaffected by the doctrine of landlord and tenant, except to show the right of the plaintiff to be on the leased premises. The liability of the defendant does not grow out of any act of the defendant as landlord, whether of omission or commission, but out of a positive act of negligence on its part, resulting in the injury complained of.

4. NEGLIGENCE—*Landlord and Tenant—Liability to Third Persons—Danger*

*Created in Making Repairs.*—If, while actually engaged in making repairs, the lessor, by himself or his servants, creates a danger on or about the premises, and a third person is injured in consequence, the lessor is, of course, liable. The liability in such cases is not, however, dependent upon or affected by the fact that the lessor had covenanted to repair, since such contract but excuses the landlord for going upon the premises. His liability is for the affirmative wrong in creating a dangerous condition, as his liability to a tenant for injuries thus occasioned.

5. Negligence—*Infant of Tender Years—Falling into Unguarded Post-Hole—Case at Bar.*—The instant case was an action for injuries to an infant who was a member of the family of a tenant of defendant. Defendant's servant engaged in erecting concrete posts left an unguarded post hole upon the tenant's premises for twenty-four hours. Rain partially filled this hole with water and the child, while playing in the tenant's yard, fell head foremost into the hole and sustained the injuries complained of.

*Held:* That the jury rightfully found that defendant was guilty of negligence and that such negligence was the proximate cause of injury to the plaintiff.

6. Negligence—*Contributory Negligence—Infant Under Three Years of Age.*—An infant under three years of age cannot be guilty of contributory negligence.

7. Negligence—*Imputable Negligence—Doctrine in Virginia.*—In Virginia, in a suit by an infant to recover damages for a personal injury, the negligence of the parent or other person having the custody and care of the infant will not be imputed to the infant.

8. Negligence—*Plaintiff Entitled to Recover Something—Verdict for Plaintiff Set Aside by Trial Court, and Judgment Entered for Defendant—Case at Bar.*—In the instant case, an action by an infant for injuries received when she fell into an unguarded post hole, through the negligence of defendant, it was claimed for plaintiff that she received a blow on the head which resulted in her becoming an idiot; whereas, defendant claimed that evidently if she received a blow on her head it would not have produced the results claimed and that in fact she was an idiot prior to the accident.

*Held:* That whether plaintiff was rendered idiotic or not by the blow could only affect the question of damages, for even though idiotic before the injury, she was entitled to recover some damages for the injury sustained, and the trial court erred in dismissing her action.

9. Expert and Opinion Evidence—*Idiocy Resulting from a Blow on the Head—Hypothetical Question not Fully Covering the Case—Case at Bar.*—In the instant case, the chief question at issue was whether a blow received by plaintiff, an infant under three years of age, caused her idiocy or whether she was a congenital idiot. It was claimed by defendant that a blow sufficient to produce idiocy would be

followed by brain-fever or paralysis, and that the plaintiff did not suffer either effect. The hypothetical question put to the experts for the plaintiff did not fully cover the case made by the testimony. It omitted the very important fact, appearing from the testimony, that the accident was not attended nor followed by any paralysis, brain fever, or serious illness of any kind. Nor was this fact brought to their attention in any way. Defendant's counsel had the opportunity to supply the omission on cross-examination, but he failed to do so with the result that the two sets of experts gave opinions upon different data.

*Held:* That it was to be feared that the jury did not have fairly presented to it this feature of the case, and, therefore, its verdict for plaintiff should be set aside and a new trial awarded on this question.

10. EXPERT AND OPINION EVIDENCE—*Personal Injury—Physical Examination of Plaintiff—Impartial Expert Appointed by the Court.*—On the trial of an action for personal injuries where plaintiff, an infant, contended that owing to the injury she had become an idiot; whereas, defendant alleged that her idiocy was congenital, existing before the injury, if either party desires it, the trial court, upon application, after reasonable notice to the adverse party, should appoint some disinterested expert in mental diseases or deficiencies to examine the plaintiff and ascertain, if he can, the cause and nature of her mental deficiency, and give such other testimony as the court may require, pertinent to the case.

Error to a judgment of the Circuit Court of Pittsylvania county, in a proceeding by motion for a judgment for damages. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Whitehead & Hurt, Harry Berman* and *Aiken & Benton,* for the plaintiff in error.

*Malcolm K. Harris,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

In 1923, Louise Tugman, an infant, suing by her mother as her next friend, instituted this proceeding by

:motion for a judgment against Riverside and Dan River Cotton Mills, Inc., seeking to recover $75,000 damages for an injury inflicted upon her in April, 1913, through the alleged negligence of the defendants. There was a verdict in her favor for $12,000, which the trial court set aside and entered judgment for the defendant. This action of the trial court is assigned as error.

The defendant owned and operated a large cotton mill in Schoolfield, a village just outside of the city of Danville, and had erected a number of houses on its property for the use of its operatives. C. H. Tugman, one of the operatives, rented one of these houses for the use of himself and family, which family included the plaintiff's mother and herself, the mother being also one of said operatives. The plaintiff lacked five ·days of being three years old, and during the daytime was usually left in charge of her grandmother.

The lots were unenclosed, but in the spring of 1913 the defendant determined to enclose them for the benefit of its tenants, some of whom wished to raise ·chickens, while others desired to cultivate flowers or .gardens.

On April 14, 1913, a force of hands was put to work· by the defendant to make the desired enclosures. Some ·of them dug the holes and placed the concrete posts in them, while others followed and set the posts and put ·the wire thereon. Late in the afternoon of April 14, 1913, they dug two holes on the Tugman lot. Into one they placed a concrete post, but the factory whistle ˙blew about ·the time the second hole was completed, .and no post was put into it, though one was lying on the ground beside the hole, and it was left unguarded .and unprotected in any way. This hole was about two feet deep and probably eighteen inches in diameter. .It rained during the night of the 14th and the forenoon

⌐of the 15th, and this hole became partially filled with water.   During the afternoon of the 15th, the plaintiff (three years of age) and other children were playing in the Tugman yard, and the plaintiff fell head foremost into the hole, with only her feet sticking out.   Alarm was given by one of the children, and she was, after some delay, drawn out of the hole in a partially drowned condition.   Dr. Jennings, who was close by, was called in and she was resuscitated in about a half hour.

This hole was dug in or near the path "in the alley way between the houses," which path led "from the back porch to the hydrant," but was not used much, ⌐as the occupants of the Tugman house usually "went through the house rather than around by this path." One of the witnesses for the plaintiff located the post holes "just a little way" from the path, "practically in the path."   Neither says it was "right in the path." The path was "inside the premises" leased by Tugman.   The record does not show that any member of ⌐the Tugman family knew of the location or exposed condition of the hole.   The nearest approach to such knowledge is the testimony of an aunt who simply said she "knew they were digging some holes" the day before, without giving their location or condition.

[1, 2] Upon this testimony, the defendant denies liability, basing its defense on the ground that the danger was open and obvious and on the further ground of the contributory negligence of those in charge of the plaintiff.   What would be an obvious danger to an adult would not be such to an infant under three years of age.   The circumstances were such that the defendant must have known that its houses were rented to tenants with families having children of all ages, and that the existence of such a hole in such a location would be a menace to the safety

of children of tender years. The accident that happened was a very unusual one, but if men of ordinary care and prudence could have foreseen that leaving the hole unguarded was liable to result in injury to others, it is immaterial that the particular injury which followed was not reasonably to have been anticipated. *Norfolk & W. R. Co.* v. *Whitehurst,* 125 Va. 260, 99 S. E. 568, and cases cited.

The defendant relies upon a line of cases of which *Berlin* v. *Wall,* 122 Va. 425, 95 S. E. 394, L. R. A., 1913D, 161, is a type, that a landlord is not "responsible for the happening of an accident (to unattended small children of tenants) from a possible danger, the existence of which was disclosed to the parents and natural guardians of the infant plaintiff and of which the defendants (landlords) had given sufficient warning" at the time of making the lease. Many cases are also cited by counsel for the plaintiff relating to the relative duties of landlord and tenant as to repairs made by the former.

[3] This case is unaffected by the doctrine of landlord and tenant, except to show the right of the plaintiff to be on the leased premises. The liability of the defendant does not grow out of any act of the defendant as landlord, whether of omission or commission, but out of a positive act of negligence on its part, resulting in the injury complained of.

[4] In 16 R. C. L., p. 1066, sec. 587, it is said: "If, while actually engaged in making repairs, the lessor, by himself or his servants, creates a danger on or about the premises, and a third person is injured in consequence, the lessor is, of course, liable. The liability in such cases is not, however, dependent upon or affected by the fact that the lessor had covenanted to repair, since such contract but excuses the landlord

for going upon the premises. His liability is for the affirmative wrong in creating a dangerous condition, as his liability to a tenant for injuries thus occasioned."

Again, at page 1046, section 565, it is said: "A distinction is made by the authorities between nonfeasance and misfeasance of the landlord. In other words, the law distinguishes between the failure or refusal of the landlord to do what he has not promised to do, or is not legally bound to do, and his doing it in a negligent manner, but if the landlord voluntarily repairs and actually enters upon the carrying out of his scheme of repairs, he will be responsible for the want of due care in the execution of the work, upon the principle of liability for negligence, without reference to any question of implied contract to repair or implied consideration. Even in those jurisdictions where it is held that a tenant cannot sustain an action of tort for personal injuries received by him because of the breach of the landlord's covenant to keep the premises in repair, if the landlord makes the repairs in accordance with the agreement, and is negligent in making them, the tenant may recover for resulting personal injuries."

[5] We are of opinion that the jury rightly found that the defendant was guilty of negligence, and that such negligence was the proximate cause of injury to the plaintiff.

[6] An infant under three years of age cannot be guilty of contributory negligence.

There is conflict of authority as to the right to impute to an infant the negligence of its parent or other person having custody and control of the infant.

In 2 Cooley on Torts (3d ed.), p. 1464, it is said: "In an action brought in New York for a negligent injury to a child two years of age, who was run over

while at play in the public street, the court held that he was not entitled to recover, because it was negligent for him to be thus exposed to injury. It is true he was not of an age to be able to judge for himself whether or not the place was one of danger, but it was the duty of parents or others having charge of him to judge for him, and if they neglected this duty, their negligence was to be imputed to him. This case has been followed as authority in several States; but rejected in others. It was very soon questioned by Ch. J. Redfield, of Vermont, in an opinion, the pith of which is comprised in the following words: 'We are satisfied that although a child, or idiot, or lunatic may, to some extent, have escaped into the highway, through the fault or negligence of his keeper, and so be improperly there, yet if he is hurt by the negligence of the defendant, he is not precluded from his redress. * * *' The conclusions in many other States have been to the same effect."

The Vermont case referred to is *Robinson* v. *Cone,* 22 Vt. 213, 224, 54 Am. Dec. 67.

Many cases are cited in support of the text, among them two of the cases from this State hereinafter referred to.

The New York doctrine announced in *Hartfield* v. *Roper*, 21 Nend. 615, 34 Am. Dec. 273, that the negligence of parents and others having charge of an infant will be imputed to the infant has been distinctly repudiated in this State in suits by infants to recover for injuries sustained by them. *Norfolk & P. R. Co.* v. *Ormsby*, 27 Gratt. (68 Va.) 455; *Norfolk & W. R. Co.* v. *Groseclose*, 88 Va. 267, 13 S. E. 454, 29 Am. St. Rep. 718. In the latter case the question is carefully considered, and numerous cases cited in the opinion of Lewis, P. In the course of the opinion it is

said: "Of course, it is essential to a recovery in any case that negligence on the part of the defendant be shown. But when that is proven in a suit by the child, the parents' negligence is no defense, because it is regarded not as a proximate but as a remote cause of the injury. And the reason lies in the irresponsibility of the child, who, itself being incapable of negligence, cannot authorize it in another. It is not correct to say that the parent is the agent of the child, for the latter cannot appoint an agent. The law confides the care and custody of a child *non sui juris* to the parent, but if this duty be not performed, the fault is the parent's, not the child's. There is no principle, then, in our opinion, upon which the fault of the parent can be imputed to the child. To do so is to deny to the child the protection of the law."

The same conclusion is reached in *Roanoke* v. *Shull*, 97 Va. 419, 34 S. E. 34, 75 Am. St. Rep. 791; and *Newport News* v. *Scott*, 103 Va. 794, 50 S. E. 266; *Williams* v. *Lynchburg T. & L. Co.*, 142 Va. 425, 128 S. E. 732; *Stanley* v. *Tomlin*, 143 Va. 187, 129 S. E. 379.

[7] These cases settle the doctrine in this State that, in a suit by an infant to recover damages for a personal injury, the negligence of the parent or other person having the custody and care of an infant will not be imputed to the infant.

[8] It was claimed for the plaintiff that when she fell into the hole she received a blow on the head which resulted in her becoming an idiot, whereas the defendant claimed that the facts showed that even if she had received a blow on her head, it would not have produced the results claimed, and that, in fact, she was an idiot prior to the accident. By far the greater part of the testimony and of the arguments related to

this question. But whether she was rendered idiotic or not by the blow could only affect the question of damages, for even though idiotic before the injury, she was entitled to recover some damages for the injury sustained, and the trial court erred in dismissing her action.

It is conceded that the plaintiff is now an idiot and has been such ever since the accident which occurred ten years before this action was brought. It is claimed by the defendant that the plaintiff is a congenital idiot, that is, from birth, and that this fact could be well nigh demonstrated if her counsel would permit her to be examined by an expert on mental troubles, and that the defendant had tendered such an expert and requested that she might be examined by him, but that the request had been refused by her counsel. No request, however, was made for an examination by an impartial expert to be selected by the court.

The direct testimony for the plaintiff as to her mental condition prior to her injury, including that of the persons who had the best opportunity to observe her, was to the effect that she was "a bright, forward and intelligent child," as much so as other children of her age, while similar testimony for the defendant was directly to the contrary. The verdict of the jury settled this conflict in favor of the plaintiff so far as it related to this class of evidence. If this were all we should have no difficulty on this question, but serious troubles have been suggested about the expert testimony. The experts called for the plaintiff were doctors who resided in the city of Danville, or the county of Pittsylvania, in which county the city is located, and who had examined the plaintiff recently before the trial. They testified as to the result of their examinations, and also gave their opinions based upon

the history of the case as given by the lay witnesses. The experts called by the defendant were Dr. Charles A. Easley, whose place of residence is not given, and Dr. A. S. Priddy, who had been "chief physician and superintendent of the State Colony for Epileptics and Feeble Minded near the city of Lynchburg for fourteen years," and before that time "assistant superintendent of the State hospital at Marion." Neither of the latter two had made any personal examination of the plaintiff. The facts stated in the hypothetical question propounded by counsel for the plaintiff had been testified to by one or more of the witnesses for the plaintiff, but the defendant claimed that the alleged facts were "medically impossible" and hence judicially incredible. It was also claimed by the defendant that a blow sufficient to produce idiocy would be followed by brain fever or paralysis, and that the plaintiff did not suffer either effect. Upon this point the witnesses for the plaintiff were not interrogated.

There was also introduced in evidence for the plaintiff two pictures of the plaintiff, one taken shortly before the accident, and one soon thereafter. The plaintiff was also in court for observation during the trial. The following extracts are taken from the testimony of the experts for the plaintiff.

Dr. S. Newman, whose specialty was diseases of children:

"Q. Have you ever had occasion to examine Louise Tugman, the little girl plaintiff in this suit?

"A. Yes; only once.

"Q. Did you make a thorough examination?

"A. Yes; I made a physical examination.

"Q. What is the result or conclusion from your examination?

"A. The child is suffering from brain affection. Some sort of brain lesion.

"Q. What is your diagnosis of the cause of her trouble based upon the history of the case given you?

"A. Based upon the history? The history stated that the child fell during childhood. From the history, I would make diagnosis of brain affection resulting from a fall during childhood.

"Q. Could a fall and injury to her head during childhood produce her present condition?

"A. Yes.

"Q. That is your opinion as an expert on children?

"A. Yes.

"Q. Assuming that the girl was a healthy, normal child, both mentally and physically, up to the time she was three years old; could talk and play like other children, and sing little childish songs, and when about three years old she fell into a hole, and the hole had a little water in it; fell into the hole headforemost, stayed in there some few minutes and was pulled out unconscious, and that night or the next day it was observed that she had a large knot on the top of her head, and since that time has never been able to speak or reason and appears to have lost her senses, what would you think could be the cause of her present condition?

"A. Of course, that would be very natural to suspect that condition resulted from the injury.

"Q. Her present condition could very easily be the result of that?

"A. Yes."

Dr. J. E. Taylor:

"Q. This picture, the testimony shows, was taken a month or two months before she fell into that hole. Tell the jury whether or not you detect anything other than a normal, bright, intelligent child?

"A. No.

"Q. I want to ask you this hypothetical question. Assuming that this child was a bright, normal, intelligent child until she was about three years of age, and at that time this child fell into a post hole, some two or three feet deep, filled with water; that she fell into this hole headforemost; was taken out of the hole almost drowned, and that shortly thereafter there developed on the top of this child's head a large pone or rising; that from the time of that injury that child has never spoken or been able to exhibit any signs of intelligence; that up to that time she could talk, sing, and play as a normal child.  I ask you whether the injury was the cause of the child's condition, assuming these facts to be true?

"A. I do.

"Q. Did you find upon your examination of this little girl any symptom or sign of inherited disease or inherited idiocy?

"A. None at all."

Dr. J. L. Jennings:

"Q. Tell the jury what would be the natural effect on a child who had fallen into a hole, practically filled with water, and was almost drowned, and after being taken out of the hole and resuscitated, but within a short time, a large bump or pone appeared on the soft part of the child's head, who was at the time about three years old.  Tell the jury what would be the effect of such a condition?

"A. Was the child rendered unconscious from this fall?

"Q. Yes.

"A. It is entirely possible for an injury to produce a condition whereby, particularly you take a young child, the bones of the head are not developed, and

are not firm, and they are more susceptible to injuries than an older person would be, and if the child was rendered unconscious from the fall, the natural inference would be that, if it were determined that the mentality did not develop, the injury may have been the cause of it.

"Q. What would be the effect on the nervous system?

"A. Lack of development. A child may develop physically, but not mentally. Frequently we see idiots who are very large. Such children do not survive or live to adult life because of accidents and disease. They are not able to take care of themselves like normal persons. That is why we do not see so many in adult life.

"Q. What effect would such a fall as that and such a condition as I have described have upon the brain of a child?

"A. The brain center is the development center that presides over everything. It is the center of life and injuries to the brain itself can cause a multitude of symptoms, mentally and physical.

"Q. Assuming that this child was a normal child before it fell into the hole, and after it fell into the hole it lost its power of speech and power of reasoning, and did not shed tears for some time afterwards, and then for a short time only, would you or not say that the injury received from falling into the hole caused the condition which followed?

"A. Of course, excluding other things, I would say, yes.

"Q. Did you see any symptoms in this child of any inherited disease of any kind that might have or could have led to insanity of any sort, from your examination?

"A. No.

"Q. Aside from the fact that this trauma or falling into the hole could have caused the nervous condition into which the child has developed, and the loss of speech and loss of reason, could it or not have brought about convulsions?

"A. You mean this injury? Yes."

Dr. W. P. Parrish:

"Q. Assuming that this girl was three years old at the time she fell into this hole and that she was normal up to that time; could talk, play and sing like other children, and after she fell into this hole a large knot about the size of a hen's egg appeared on her head the night after she fell into that hole, where the front part and back part of the head come together, the soft part of the skull, and after that time she was never able to talk or play or sing or have any reason about her at all, nor ever able to shed tears, would you or not, as a mental expert, say that condition was caused by falling into that hole?

"A. It could have been, I should think.

"Q. How long is it usually the case before a child is known to be an idiot after birth?

"A. About eighteen months you ought to tell."

On the other hand, Dr. Easley, a witness for the defendant, testified as follows:

"Q. What percentage of idiots are born and what percentage acquired, if you can tell?

"A. I do not know that I can answer that. A very large percentage, seventy-five or eighty per cent. are born idiots.

"Q. When you come to acquired idiocy, will you please tell us what your definition of acquired idiocy is and how acquired?

"A. An acquired idiot is a child who sustained some injury of the brain at birth or shortly thereafter.

"Q. Have you ever heard or read in your medical education of a person being caused to be an idiot by partial drowning?

"A. No.

"Q. If a child had reached the point of three years of age, can you state whether or not, in your opinion, you consider it medically possible for it at that age to receive an injury to the brain which would render it an idiot?

"A. Yes; but I must qualify that.   Ordinarily I would say no, it is medically impossible.   If a child sustains an injury to the brain sufficient to produce idiocy it might come on later, you have got evidence of an injured brain at the time and for a time afterwards, but so far as immediate effect is concerned, I would say not.

"Q. Is it possible in your opinion that a child could be a normal, healthy child, fall into a hole and from that day forward it was rendered an idiot?

"A. No; that is not in the realm of possibility.

"Q. If a person received sufficient injury to the brain to cause them to, as commonly express it, lose their mind or their mind to be affected, can you tell the jury what would be the apparent immediate effect of it?

"A. In what way affected?

"Q. So as to render its mind gone?

"A. An idiot?   Well, a person to sustain an injury on the head sufficient to make an idiot, if not an idiot before, would suffer a very acute brain fever of some type.   That is the English of it.   Brain fever of some type.   Or it could have another condition in which it would have hemorrhage of the brain—pressure. In that case, you would know it by paralysis, and later, without an operation, the brain would fail to

develop and if you could not free the brain from the blood clot, you would have an idiot.

"Q. Those symptoms would be apparent to an ordinary physician?

"A. Yes.

"Q. You say you would have brain fever. Will you describe if that would make a patient seriously ill?

"A. By brain fever you usually mean meningitis or inflammation of the brain and spinal cord. You have a very ill person always if you have that condition.

"Q. Would that be critical illness?

"A. Yes.

"Q. As I understand it, if a person had an injury to the brain sufficient to cause them to lose their mind or become feeble-minded, that would develop from paralysis of the limbs or some part of the body or they would have brain fever which would be a serious condition?

"A. Yes; that covers it, I think.

"Q. In the absence of these symptoms, is it medically possible that they could have had an injury which would render them an idiot?

"A. No."

Dr. A. S. Priddy, a witness for the defendant, testified as follows:

"Q. It appears that a child about three years of age is claimed to have fallen into a post hole about two feet deep in which there was water. She was taken out suffering from partial drowning; was brought to by a physician who came immediately; that physician observed no ill effects except temporary from drowning. There was no paralysis, loss of memory or consciousness. The physician who was called later found the child apparently recovered. It is now claimed that that child is a hopeless idiot and that the condition resulted from its fall. Will you explain, if you

can, your conclusion and reason therefor—whether that is medically possible?

"A. It is inconceivable and inconsistent with my knowledge of mental medicine and my experience that such a condition could have existed. Had the child received an injury of sufficient importance to make a permanent mental impression, it would have shown; direct injury to the brain would have resulted and would have shown by physical suffering such as motor-paralysis.

"Q. Would they have been such symptoms as any doctor would have seen?

"A. Any physician of ordinary intelligence and skill would have discovered it.

"Q. Will you please state whether in your long experience you have ever heard of or observed any person rendered an idiot by an injury to the head?

"A. You mean after birth?

"Q. Yes.

"A. I have not."

On cross-examination he testified as follows:

"Q. Assuming that there was a child about three years old and during all her previous life she was apparently healthy and normal, intelligent, bright, could talk and sing songs, go to the store and buy candy and nobody noticed anything wrong with her and she fell into a hole which was deep enough to take in her whole body, leaving her feet sticking out, filled with water, by the side of which was a concrete post, and remained in there for some time, and when she was pulled out of the hole she was practically drowned, and soon after a large 'pone' developed on the top of her head right where the fore part and the back part of her skull join, what we call the soft part of a child's brain, and after that time she was never able to speak

again, never able to talk again, never able to sing any more songs, and practically lost her power of reasoning and of speech, would you or not say that that fall into that hole could have caused that condition?

"A. I am not willing to assume that such a condition could be true.

"Q. I am asking you a hypothetical question and you must assume that?

"A. The assumption would be ridiculous with any knowledge of idiocy or mental defects or mental diseases.

"Q. I did not ask you whether it would have caused idiocy or what it would have caused, but I ask you this—if that fall could not have produced in that child her condition, whatever it was, whether idiocy, epilepsy, or insanity or any other mental imperfection?

"A. Without any physical evidence of injury?

"Q. This large pone on the top of her head?

"A. That is just a natural sign. No brain pressure. I cannot assume that such a condition is consistent with my knowledge.

"Q. You answer the question by saying that you cannot assume such a condition existed?

"A. No; I do not believe it did.

"Q. You mean you will not assume that?

"A. No; because I do not believe that such a condition existed."

It will be observed that Dr. Priddy declined to answer the hypothetical question put to him on cross-examination on the ground that the hypothesis involved an absurdity. He goes further and states that he refuses to assume the existence of the facts hypothetically stated, and which had been testified to by lay witnesses for the plaintiff, "because I do not believe that such a condition existed," which, of course,

was a contradiction of the witnesses for the plaintiff who had so testified.

[9] The hypothetical question put to the experts for the plaintiff did not fully cover the case made by the testimony. It omitted the very important fact, appearing from the testimony, that the accident was not attended nor followed by any paralysis, brain fever, or serious illness of any kind. Nor was this fact brought to their attention in any way. Whether or not they took it into consideration does not appear, and what answers they would have made if it had been brought to their attention we do not know. Their answers to the question whether the child's injury was the cause of her mental condition are far from positive. One of them says "I do" whatever that may mean; another, that "it is entirely possible;" another "excluding other things, I would say yes;" and another, "it could have been, I should think." Are these answers in conflict with the testimony for the defendant that in view of the absence of any serious sickness attending or following the accident the result claimed was "medically impossible?"

This feature of the case has given us the most serious concern, but from the best consideration we have been able to give it, the expert testimony cannot be said to be in conflict. The experts for the plaintiff have based their opinions upon a different state of facts from those considered by the experts for the defendant. Those for the plaintiff apparently have not taken into consideration the absence of any serious illness of the plaintiff, while those for the defendant have taken it into consideration. It is plain from the testimony that there was no such serious illness or paralysis, and this was a material fact which was a part of the history of the case, and of vital importance

in giving an expert opinion based on such history. The history was incomplete without it. It is true that the defendant's counsel had the opportunity of supplying the omission on cross-examination, but he failed to do so, with the result that we have two sets of experts giving opinions upon different data. The danger is that the jury may have simply accepted the opinions, without considering the data or premises upon which they are based. This danger, it is true, exists in all cases where the expert gives an opinion, based upon data furnished by other witnesses, and it is often true that the questioner may base his hypothetical question upon as much of the data furnished as he sees fit, and is not bound to embrace all of the undisputed facts, yet where a consideration of the undisputed fact is essentially necessary to a correct answer to the hypothetical question, its omission would be misleading to the jury in considering the weight to be given to the answer to the question. The undisputed fact in the instant case was very material, and its omission was a failure to give such a history of the case as would enable the experts to give an intelligent opinion based upon the history, left the data stated in a false relation to the case, and may have induced answers which would not otherwise have been given. *Barber's Estate*, 63 Conn. 393, 27 Atl. 973, 22 L. R. A. 90; *Peterson* v. *Railroad Co.*, 38 Minn. 515, 39 N. W. 485; *Nichols* v. *Railroad Co.*, 25 Utah 240, 70 Pac. 996; *People* v. *Vanderhoof*, 71 Mich. 176, 39 N. W. 28. Compare 1 Wig. Ev. (1st ed.) sec. 682, and cases cited, for divergent.

It is true that no specific objection was made by counsel for the defendant to the hypothetical question put by counsel for the plaintiff, and that he could have remedied the defect by cross-examination. Still the

facts of this case are so peculiar, so long a time was allowed to elapse after the injury before suit, and without the suggestion of a complaint, the omitted and undisputed fact is so impressive and so needful of explanation, and the testimony of the experts is so divergent in consequence of the relation of such fact to their opinions, we are apprehensive that the jury did not have fairly presented to it this feature of the case, and for this reason its verdict should be set aside, and a new trial awarded on this question. The ends of justice seem to require it. Furthermore, while the specific objection was not formally made, the defects in the examination of the plaintiff's experts were very pointedly and sharply made by the examination of the defendant's experts, and the plaintiff offers no evidence in rebuttal. The plaintiff was thus put upon notice that the opinions of her experts were based upon data which omitted all consideration of a material undisputed fact, which was essential to be considered in the formation of any correct opinion.

The effect, if any, of the injury upon the mental condition of the plaintiff constituted her chief element of damage, and this is left in so much doubt and uncertainty by the expert testimony that it would not be fair to the defendant to permit the verdict to stand. On another trial, the difficulties suggested can be overcome, and the real damage sustained by the plaintiff can be properly ascertained.

[10] The trial court committed no error in setting aside the verdict of the jury, but it did err in dismissing the plaintiff's case, for the reasons hereinbefore stated. For this error its judgment must be reversed and the case remanded to the trial court, with directions to reinstate the case on its docket and to grant the plaintiff a new trial in order to ascertain

the amount of damages sustained by her.    If either party desires it, the trial court, upon application, after reasonable notice to the adverse party, should appoint some disinterested expert in mental diseases or deficiencies to examine the plaintiff and ascertain, if he can, the cause and nature of her mental deficiency, and give such other testimony as the court may require, pertinent to the case.    4 Wig. Ev. (1st ed.) sec. 2220.

*Reversed.*