# Wytheville

PAUL WESSELLS V. COMMONWEALTH.

June 13, 1935.

Present, All the Justices.

The opinion states the case.

*Mapp & Mapp,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson* and *D. Gardiner Tyler, Jr., Assistant Attorneys-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

The plaintiff in error was convicted of murder in the first degree and his punishment fixed at life imprisonment in the penitentiary. The trial court overruled a motion to set aside the verdict of the jury and entered thereon the judgment which is brought under review by this writ of error.

After the arraignment of the accused and his plea of not guilty, the record discloses that when the prospective jurors were selected by lot and called to the bar to be examined upon their *voir dire,* the name of Otho T. Kelley appeared upon the list. So far as the record shows, without any examination of Kelley as to his fitness for jury service, or without any request upon his part to be excused from jury service, the court, without challenge of either the attorney for the Commonwealth or counsel for defendant, but over the objection of the defendant, ex-

cluded Kelley as a juror on the ground that he "was busy picking tomatoes." That action of the court is assigned as error.

Section 5985 of the Code, as amended, Acts 1932, chapter 141, page 161, exempts from jury service "any fruit grower while actively engaged in harvesting his crops."

In his second edition of the New Merriam-Webster International Dictionary, the word *tomato* is thus defined: "South American perennial herb widely cultivated, usually as an annual for its fruit."

If it be conceded that Kelley was a fruit grower, then clearly he was exempt from jury service, but in no sense was he disqualified for that reason. In other words, upon request to the court (if it was a fact that he was "actively engaged in harvesting his crops"), that he be excused from serving on the jury, then it was the duty of the court to grant his request; but, as stated, the record does not disclose that Kelley asked to be excused, and therefore, we have no right to assume that he did.

Section 4895 of the Code, as amended by Acts 1920, chapter 23, page 24, provides, in part, that the writ of *venire facias* in case of felony shall command the officer to whom it is directed to summon twenty persons for jury service, selected from a list of twenty-four persons furnished him by the clerk of the court. The mode of selecting jurors has undergone a radical change in recent years. Instead of the jury list being now prepared by the court, it is now prepared by a jury commission selected by the court. The former method of completing the panel when there is a deficiency of jurors has also been changed by the adoption of section 4896. Formerly it was the province of the court to summon from the bystanders a sufficient number of persons to complete the panel; but under the provisions of section 4896 the mandatory duty is imposed upon the court to supply the deficiency by selecting from the names on the list provided for by sections 5988 and 5990 a sufficient number of

names to complete the panel. It is thus seen that it was the manifest intention of the legislature to divest the trial court of its former prerogative in the selection of juries, and to us it is manifest that the court cannot, in the exercise of an arbitrary power, deplete the jury panel over the objection of an accused. If the court had the arbitrary power to exclude Kelley for the reason that he "was busy picking tomatoes," then it had the power to exclude all jurors who were exempt under the provisions of section 5985, as amended, notwithstanding the jurors were not disqualified from serving and were willing to serve as jurors. To permit the court to arrogate to itself such a power is to permit the court to take from the accused the statutory right of being tried by a jury selected by lot, and to substitute therefor a jury selected by the court.

This conclusion in no wise impinges upon the doctrine announced in *Fishburne's Case,* 103 Va. 1023, 50 S. E. 443. In that case the question was whether or not the action of the trial court in excluding, upon the motion of the Commonwealth, two jurors, denied the prisoner a fair and impartial trial. It was held that the action of the court did not constitute reversible error, for the reason that the error of judgment upon the part of the court was harmless inasmuch as the accused was afforded a trial by an impartial jury duly qualified.

In the case at bar no error of judgment is involved. The vice in the ruling of the trial court is usurpation of a legislative prerogative—a prerogative peculiarly within the province of the legislative branch of the government.

It is error, where a juror on his *voir dire* is discharged when he should have been accepted, but this error is cured if his place is afterwards filled by one who is also competent. This situation is entirely different from that in which a judge, of his own motion, tells a competent juror to stand aside.

In our opinion, the first assignment of error is well founded.

We come now to a discussion of the several other alleged errors committed by the trial court.

The case made by the Commonwealth is as follows: In August, 1933, the accused, while under the influence of liquor, engaged with Dewey Coard in a fist fight in which the accused was severely beaten, and shortly after the fight accused stated to Gus Parker that "he had been in trouble with Coard and that he was going to get even." From the day of the fight to the time of the tragedy the two men had not spoken to each other, though they lived in the same neighborhood in the village of Greenbush and came in contact almost daily. On Saturday, July 28, 1934, Coard and the accused, who had been drinking to excess, were in the store of J. S. Mathias; besides accused and Coard, there were several other people in the store; the accused went into the toilet which was in the rear of the store and there obtained the handle of a wire stretcher which had been used to prop back the door; with the club held behind him, he re-entered the store, walked up behind Coard who was sitting in a chair, leaning back against a post, and without any warning whatsoever, struck him two or more blows, from the effects of which Coard shortly thereafter died. Ralph Mathias told accused to stop and took the club from him; he then left the store and went to a nearby house, sat down upon the front steps and said to a little boy by the name of Sawyers, "Some more of your damn business. * * * I will get even with any man that treats me like that." After his arrest by Warner Davis, accused stated: "I wouldn't have done this but I had a fight with Dewey about a year ago as you know. I wasn't able to whip him with my fist and I made up my mind that the next time I had something I could use. I guess I made a mistake to talk to you."

The defense relied upon was insanity, both hereditary insanity and insanity superinduced by the use of drugs and liquor.

The evidence offered by the accused was, in substance,

as follows: At the time of the offense accused was thirty years of age; he was a high school graduate; while attending a business college in Wilmington, Delaware, he suffered a severe attack of scarlet fever which necessitated his leaving and he did not thereafter re-enter school; after his return home he began using intoxicants. His drinking increased during the years and for several months prior to the killing accused not only drank liquor to excess, but became addicted to the use of aspirin, Bateman's drops, essence of peppermint and various so-called cordials. One witness testified that he had seen accused take two dozen aspirin tablets within thirty minutes; that he became slovenly in his dress, complained of physical pains and was very gloomy and morose. The evidence further showed that in the year 1924 the mother of accused had been treated for mental trouble; that in recent years it became necessary to send her to a sanatorium to be treated for a nervous disorder; that the maternal grandfather of accused was mentally unsound; that a great aunt of the accused died in the hospital for the insane at Williamsburg; that on the paternal side eight of his relatives were considered mentally unsound; that some of them had committed suicide; that one, while insane, had died in jail and that one was at that time confined in an asylum.

Dr. James K. Hall, an expert in mental diseases, testified that in his opinion the accused, at the time of the killing, neither possessed sufficient will power to restrain his murderous impulse nor understood the seriousness of the act. In rebuttal, the Commonwealth introduced lay witnesses and Dr. W. L. Kellam who testified that accused was sane.

The refusal of the court to sustain the objection of accused to the evidence of Dr. Kellam, on the ground that he was not an expert, and the refusal of the court at the conclusion of his evidence to sustain a motion to strike the same is assigned as error.

It was shown that Dr. Kellam had been a prac-

ticing physician for many years. The competency of a witness is a question for the court, and unless it is shown that the court has abused its discretion in the admission of evidence, this court will not interfere. No abuse of discretion has been shown in this case. Upon his examination Dr. Kellam was asked this question:

"Based on the record in this case and your examination, would you or would you not say that on the day that Paul Wessells hit Dewey Coard with a club, which has been introduced in evidence, and from which blow or blows Dewey Coard died, that Paul Wessells at the time, was sane or insane?"

The answer of the witness to the question covers practically two pages and would but encumber this opinion to set it out in full. In the petition for a writ of error this is said:

"We do not believe that a case has ever been presented to this Honorable Court, in which a man's life was at stake where a doctor has been given by the Circuit Court the latitude given Dr. Kellam in the instant case. He did not testify as an expert, but he made a most powerful and effective argument in behalf of the Commonwealth."

██ After an experience of more than thirty years as a lawyer and a judge, we are constrained to agree with the contention of counsel for the accused. Throughout the entire answer the doctor discusses the evidence from almost every angle and draws his own conclusions on the conflict of evidence. Such is not the province of a witness, even though he be testifying as an expert. The question propounded was susceptible to an affirmative or negative answer and did not call for what practically amounted to an argument of the case. There is nothing sacrosanct about the evidence of an expert witness and the usual method of obtaining testimony from an expert, in a case involving a question of insanity, is for counsel to propound a hypothetical question embodying all the material facts which the evidence tends to prove affecting the question upon which the witness is

asked to express an opinion. *Lester's Ex'r* v. *Simpkins,* 117 Va. 55, 83 S. E. 1062; *L. J. Upton & Co.* v. *Reeve,* 123 Va. 241, 96 S. E. 277; *Tugman* v. *Riverside, etc., Cotton Mills,* 144 Va. 473, 132 S. E. 179. See 11 R. C. L. 588.

Of course the above stated method is in addition to a personal examination of the accused.

In *Livingston* v. *Commonwealth,* 14 Gratt. (55 Va.) 592, 604, this court dealt with the latitude to be accorded an expert witness. Judge Daniel, speaking for the court, said: "But it would seem to be generally agreed that in such case the opinion of the witness is to be restricted to matters of science, and that he is not to be allowed to give an opinion on things with which a jury may be supposed to be equally well acquainted. 3 Philips 761, notes. And especially, that the questions should be so shaped and the answers so given as to exclude any opinion of the medical witness as to the credit of the witnesses on the truth of the facts testified to by others."

See *McMechen* v. *McMechen,* 17 W. Va. 683, 41 Am. Rep. 682; *Mitchell* v. *Commonwealth,* 141 Va. 541, 127 S. E. 368; *Thornton* v. *Commonwealth,* 113 Va. 736, 73 S. E. 481.

In our opinion the refusal of the court to sustain the motion constitutes reversible error.

The refusal of the court to give the following instructions is assigned as error: "The court instructs the jury that, upon the trial of this case, if a reasonable doubt of any fact necessary to establish the guilt of the accused as charged in the indictment be raised by the evidence, or lack of evidence, such doubt is decisive, and the jury must acquit the accused, since a verdict of 'not guilty' means no more than that the guilt of the accused has not been established in the precise, specific, and narrow form prescribed by law.

"The court instructs the jury that if any juror in this case has such reasonable doubt after hearing the evidence in this case, receiving their instructions of the court and listening to the arguments of counsel, such

juror should not agree to a conviction of the accused that is opposed by such a doubt.

"The court instructs the jury that the character of the accused when proved in a case, whether good or bad, is a fact to be considered by them, and if the jury from the evidence have any reasonable doubt as to the guilt of the accused you should acquit him."

 It must be conceded that the instructions embody the familiar doctrine on the question of reasonable doubt, and were this not a case where the defense of insanity was interposed, it would be error to refuse to give them. There is, however, another doctrine as universally recognized, and that is, that every man is presumed to be sane and responsible for his acts until the contrary appears, and the burden of proving insanity is on the person who alleges it. When the *corpus delicti* has been established and proof adduced that the accused committed the act, it is not sufficient for the accused to raise a reasonable doubt as to his sanity; he must go one step further and prove to the satisfaction of the jury that he was insane at the time of the commission of the act.

It is shown by the cases given below that this doctrine is firmly planted in our jurisprudence. In *Baccigalupo's Case,* 33 Gratt. (74 Va.) 807, 817, 36 Am. Rep. 795, quoting from *Boswell's Case,* 20 Gratt. (61 Va.) 860, 868, this instruction was approved: "The jury are instructed that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes until the contrary is proved to the satisfaction of the jury." To the same effect are the holdings in *Thurman's Case,* 107 Va. 912, 916, 60 S. E. 99; *Hite's Case,* 96 Va. 489, 492, 31 S. E. 895; *Dejarnette's Case,* 75 Va. 867, 878.

In *Dejarnette's Case, supra,* the defendant interposed the defense of insanity. The court was asked to give an instruction which declared "that the prisoner is to be acquitted on the ground of insanity, unless the jury are satisfied beyond a reasonable doubt that the killing was

not produced by mental disease." The refusal of the court to give the instruction was assigned as error. In sustaining the action of the trial court, Judge Staples said: "The proposition asserted in this instruction is manifestly based on the idea that the jury must be satisfied beyond all reasonable doubt of the sanity of the accused, precisely as the prosecution is required to prove the guilt of the defendant to warrant a conviction. It is in direct conflict with the decisions of this court in *Boswell's Case*, 20 Gratt. (61 Va.) 860, 876, and *Baccigalupo* v. *Commonwealth*, 33 Gratt. (74 Va.) 807 (36 Am. Rep. 795).

"In these cases it was unanimously held that the Commonwealth, having established the *corpus delicti*, and that the act was done by the accused, has made out her case. If he relies on the defense of insanity, he must prove it to the satisfaction of the jury. If, upon the whole evidence, they believe he was insane when he committed the act, they will acquit him on that ground; but not upon any fanciful idea that they believe he was then sane, yet, as there may be a rational doubt of such sanity, he is therefore entitled to an acquittal. Insanity is easily feigned and hard to be disproved, and public safety requires that it should not be established by less than satisfactory evidence."

In *Longley's Case*, 99 Va. 807, 812, 37 S. E. 339, 341, where the charge was murder and the defense was insanity, the court approved this instruction: "The court further instructs the jury that the law presumes the accused to be innocent until he is proved guilty beyond a reasonable doubt, and if there is upon the minds of the jury any reasonable doubt of the guilt of the accused, the law makes it their duty to acquit him, and that mere suspicion or probability of his guilt, however strong, is not sufficient to convict, nor is it sufficient if the greater weight of preponderance of evidence supports the charge in the indictment. But to warrant his conviction, his guilt must be proved so clearly, and the evidence thereof

must be so strong, as to exclude every reasonable hypothesis of his innocence. But in this connection the court further tells the jury that in cases like this, where the prisoner sets up the defense of insanity or irresponsibility produced by voluntary intoxication, he cannot rely simply on having raised a rational doubt in the minds of the jury as to whether he was so drunk at the time he committed the crime as not to be responsible therefor, but the burden is upon him to prove this fact to the satisfaction of the jury as fairly results from all evidence."

There is no merit in this assignment of error.

The next assignment of error is based upon the giving of this instruction: "The court further instructs the jury that if they believe from the evidence that previous to the time of the killing, there was a grudge on the part of the prisoner toward the deceased; that the prisoner had previously declared that he would get even with the deceased; and that he killed the deceased because of this aforesaid grudge, then such killing was willful, deliberate, and premeditated, and is murder in the first degree."

The vice in the instruction is that it entirely ignores the defense of insanity. All that is said in the instruction may be true, yet the accused, if insane at the time of the killing, would not be guilty of murder. Upon a new trial it would be proper to give the instruction with this addition inserted after the second time the word "grudge" appears: "that the prisoner was sane at the time of the killing."

The next assignment of error is based upon the refusal of the court to sustain the motion of the accused, to discharge the jury because of alleged improper argument of counsel who assisted in the prosecution of the accused, and alleged improper argument of the attorney for the Commonwealth. The Attorney General concedes that the arguments were improper, but as the case will be reversed for other reasons, it is not necessary to discuss this assignment of error.

■ There is no merit to the assignment of error that the jury were committed to the custody of the sheriff without his having first taken oath to keep them together. The record shows that upon the adjournment of court, the jury were regularly committed to the custody of two deputies to whom the customary oath was administered, to keep the jury together, etc.

The last assignment of error relates to the refusal of the court to set aside the verdict because it is contrary to the law and the evidence.

In view of the remand of the case for a new trial, it would be improper for the court to pass upon that question.

The judgment of the lower court is reversed, and the case is remanded for a new trial.

*Reversed and remanded.*

HUDGINS, J., concurring.

I fully concur with the conclusion reached in the foregoing opinion, but do not agree with that part of the opinion which holds that the trial court committed error in excluding from jury service Otho T. Kelley. My reasons for this position are briefly as follows:

All persons charged with a felony are entitled to have a panel of twenty prospective jurors, free from exception. From this panel the Commonowealth is entitled to strike four and the accused four, thereby leaving a jury of twelve to try the issue. The ministerial officers are authorized to draw only twenty-four names from the jury list. It is the duty of the sheriff from this list to summon only twenty prospective jurors. It is a matter of common knowledge that at the majority of the regular terms of the trial courts the sheriff, a ministerial officer, at each term excuses or fails to summon at least four of the twenty-four persons whose names are drawn for jury service. The statute wisely authorizes the trial judge in certain cases to increase the number of persons

to be summoned as prospective jurors. He may do this in one of two ways: (1) Either in term or in vacation he may authorize the parties charged with the duty of drawing the names of jurors from the list to increase the number to be drawn; or, (2) under the provisions of section 4896, as amended by Acts 1924, chapter 478, page 764, where a sufficient number of jurors, free from exception, cannot be had from those summoned and in attendance, or where the *venire facias* or panel has been quashed, the judge may select from the jury list and cause to be summoned so many persons as may be necessary to complete the panel of twenty, free from exception, to constitute the jury to try the case.

The record in this case shows that Kelley was one of seven persons summoned excused from jury service, so that more than twenty persons were summoned and in attendance as prospective jurors for the trial of the accused, but the record does not show which method the trial court used in obtaining their attendance. All the record discloses on the subject is contained in the following excerpt.

"Note: When the jury were selected by lot and called to the bar to be examined upon their *voir dire*, Otho T. Kelley, without challenge by either the attorney for the Commonwealth or attorney for the defendant, was set aside and excused as a juror on the ground that the said Kelley was busy picking tomatoes, the said Otho T. Kelley being a competent juror, free from exception.

"Note: Exception noted by attorneys for the defendant.

"Note: Mr. Carey Milliner excused by reason of the fact that his wife was a second cousin of Dewey Coard. Two other jurors excused by reason of fact that they were opposed to capital punishment.

"The Court: Mr. Matthews, you spoke to me about excusing you, what is the trouble?

"Mr. Matthews: The truth is I have been operated on and don't feel able to serve.

"The Court: You are excused.

"Mr. Mapp: Exception noted.

"Note: * * * Young was excused as a juror on the ground that he lived under two miles from Greenbush.

"The Court: Have any of you gentlemen made up or expressed an opinion as to the merits of this case?

"Mr. Dunham: I have.

"The Court: What is that opinion based on?

"Mr. Dunham: I am well acquainted with the two parties, heard it discussed, naturally interested in the case.

"The Court: What you heard, would that have any effect on your oath as juror?

"Mr. Dunham: I am afraid it would.

"The Court: You are excused.

"Note: Jury sworn."

The majority opinion holds that Kelley, because he was "picking tomatoes," was exempt from jury service, but the record fails to disclose that he had claimed this exemption. While the record is not as clear on the point as it might be, it does show that immediately after the accused had plead to the indictment, the court, in the presence of the accused and attorneys, began to examine the prospective jurors in their *voir dire*. The stenographer reporting the case did not attempt to accurately record all the proceedings, but simply made a note summarizing the conclusion with the reason therefor.

It is a matter of common knowledge that trial judges are reluctant to excuse men regularly summoned for jury service even when the requests are based on substantial grounds. It seems to me that the only reasonable deduction to be drawn from the note relating to the fact that Kelley was excused is that he requested the court to excuse him on the grounds stated. How did the judge know that Kelley was busy picking tomatoes unless he in some way communicated that fact to him? In my opinion the trial court committed no error in excusing this juror.